60 A.3d 25

**ATTORNEY GRIEVANCE COMMISSION OF MARYLAND**

v.

**Gerald Frederick CHAPMAN.**

**Misc. Docket AG No. 44, Sept. Term, 2011.**

Court of Appeals of Maryland.

Jan. 31, 2013.

McDonald, J., filed concurring opinion.

Dolores O. Ridgell, Asst. Bar Counsel (Glenn M. Grossman, Bar Counsel, Attorney Grievance Commission of Maryland), for petitioner.

Gerald Frederick Chapman, pro se, for respondent.

Argued before BELL, C.J., HARRELL, BATTAGLIA, GREENE, ADKINS, BARBERA and McDONALD, JJ.

BATTAGLIA, J.

Gerald Frederick Chapman, Respondent, was admitted to the Bar of this Court on May 24, 1979. On October 25, 2011, the Attorney Grievance Commission ("Bar Counsel"), acting pursuant to Maryland Rule 16–751(a),[1] filed a "Petition for Disciplinary or Remedial Action" against Chapman, which incorporated two separate complaints filed by Ms. Barbara Bogarosh and Mr. John Butler. The factual bases of these charges arose out of Chapman's consulting agreement with James Weiskerger to perform loan-modification work through Chapman's law firm, Chapman Law Group, LLC. Through this arrangement, Bar Counsel alleged, Chapman cloaked JW Capital, Mr. Weiskerger's loan-modification business, with the authority of Chapman's law firm. Further, Bar Counsel alleged that Chapman's conduct "operated to misrepresent and

---

1. Rule 16–751(a) provides, in relevant part:
 (a) **Commencement of disciplinary or remedial action.**
 (1) Upon approval or direction of Commission. Upon approval or direction of the [Attorney Grievance] Commission, Bar Counsel shall file a Petition for Disciplinary or Remedial Action in the Court of Appeals.

mislead clients into believing they engaged the services of a law firm, rather than an unlicenced foreclosure consultant." Chapman was charged with violations of the Maryland Lawyers' Rules of Professional Conduct, Rules 1.1 (Competence),[2] 1.2 (Scope of Representation),[3] 1.3 (Diligence),[4] 1.4 (Communication),[5] 1.5 (Fees),[6] 1.15 (Safekeeping Property),[7] 5.3 (Re-

---

**2.** Rule 1.1 provides:

> A lawyer shall provide competent representation to a client. Competent representation requires the legal knowledge, skill, thoroughness and preparation reasonably necessary for the representation.

The relevant language of the Rules of Professional Responsibility quoted throughout this opinion remains unchanged since 2009, when the actions in this case began to take place.

**3.** Rule 1.2 provides:

> (a) Subject to paragraphs (c) and (d), a lawyer shall abide by a client's decisions concerning the objectives of the representation and, when appropriate, shall consult with the client as to the means by which they are to be pursued. A lawyer may take such action on behalf of the client as is impliedly authorized to carry out the representation. A lawyer shall abide by a client's decision whether to settle a matter. In a criminal case, the lawyer shall abide by the client's decision, after consultation with the lawyer, as to a plea to be entered, whether to waive jury trial and whether the client will testify.
>
> (b) A lawyer's representation of a client, including representation by appointment, does not constitute an endorsement of the client's political, economic, social or moral views or activities.
>
> (c) A lawyer may limit the scope of the representation if the limitation is reasonable under the circumstances and the client gives informed consent.
>
> (d) A lawyer shall not counsel a client to engage, or assist a client, in conduct that the lawyer knows is criminal or fraudulent, but a lawyer may discuss the legal consequences of any proposed course of conduct with a client and may counsel or assist a client to make a good faith effort to determine the validity, scope, meaning or application of the law.

Before the Circuit Court, Bar Counsel decided not to pursue alleged violations of Rule 1.2.

**4.** Rule 1.3 provides:

> A lawyer shall act with reasonable diligence and promptness in representing a client.

**5.** Rule 1.4 provides:

> (a) A lawyer shall:

(1) promptly inform the client of any decision or circumstance with respect to which the client's informed consent, as defined in Rule 1.0(f), is required by these Rules;

(2) keep the client reasonably informed about the status of the matter;

(3) promptly comply with reasonable requests for information; and

(4) consult with the client about any relevant limitation on the lawyer's conduct when the lawyer knows that the client expects assistance not permitted by the Maryland Lawyers' Rules of Professional Conduct or other law.

(b) A lawyer shall explain a matter to the extent reasonably necessary to permit the client to make informed decisions regarding the representation.

6. Rule 1.5 provides:

(a) A lawyer shall not make an agreement for, charge, or collect an unreasonable fee or an unreasonable amount for expenses. The factors to be considered in determining the reasonableness of a fee include the following:

(1) the time and labor required, the novelty and difficulty of the questions involved, and the skill requisite to perform the legal service properly;

(2) the likelihood, if apparent to the client, that the acceptance of the particular employment will preclude other employment of the lawyer;

(3) the fee customarily charged in the locality for similar legal services;

(4) the amount involved and the results obtained;

(5) the time limitations imposed by the client or by the circumstances;

(6) the nature and length of the professional relationship with the client;

(7) the experience, reputation, and ability of the lawyer or lawyers performing the services; and

(2) whether the fee is fixed or contingent.

(b) The scope of the representation and the basis or rate of the fee and expenses for which the client will be responsible shall be communicated to the client, preferably in writing, before or within a reasonable time after commencing the representation, except when the lawyer will charge a regularly represented client on the same basis or rate. Any changes in the basis or rate of the fee or expenses shall also be communicated to the client.

(c) A fee may be contingent on the outcome of the matter for which the service is rendered, except in a matter in which a contingent fee is prohibited by paragraph (d) or other law. A contingent fee agreement shall be in a writing signed by the client and shall state the method by which the fee is to be determined, including the percentage or percentages that shall accrue to the lawyer in the event of settlement, trial or appeal; litigation and other expenses to be deducted from the recovery; and whether such expenses are to be deducted before or after the contingent fee is calculated. The agreement must clearly notify the client of any expenses for which the

client will be responsible whether or not the client is the prevailing party. Upon conclusion of a contingent fee matter, the lawyer shall provide the client with a written statement stating the outcome of the matter, and, if there is a recovery, showing the remittance to the client and the method of its determination.

(d) A lawyer shall not enter into an arrangement for, charge, or collect:

(1) any fee in a domestic relations matter, the payment or amount of which is contingent upon the securing of a divorce or custody of a child or upon the amount of alimony or support or property settlement, or upon the amount of an award pursuant to Md.Code, Family Law Article, §§ 8–201 through 213; or

(2) a contingent fee for representing a defendant in a criminal case.

(e) A division of a fee between lawyers who are not in the same firm may be made only if:

(1) the division is in proportion to the services performed by each lawyer or each lawyer assumes joint responsibility for the representation.

(2) the client agrees to the joint representation and the agreement is confirmed in writing; and

(3) the total fee is reasonable.

7. Rule 1.15 provides:

(a) A lawyer shall hold property of clients or third persons that is in a lawyer's possession in connection with a representation separate from the lawyer's own property. Funds shall be kept in a separate account maintained pursuant to Title 16, Chapter 600 of the Maryland Rules, and records shall be created and maintained in accordance with the Rules in that Chapter. Other property shall be identified specifically as such and appropriately safeguarded, and records of its receipt and distribution shall be created and maintained. Complete records of the account funds and of other property shall be kept by the lawyer and shall be preserved for a period of at least five years after the date the record was created.

(b) A lawyer may deposit the lawyer's own funds in a client trust account only as permitted by Rule 16–607 b.

(c) Unless the client gives informed consent, confirmed in writing, to a different arrangement, a lawyer shall deposit legal fees and expenses that have been paid in advance into a client trust account and may withdraw those funds for the lawyer's own benefit only as fees are earned or expenses incurred.

(d) Upon receiving funds or other property in which a client or third person has an interest, a lawyer shall promptly notify the client or third person. Except as stated in this Rule or otherwise permitted by law or by agreement with the client, a lawyer shall deliver promptly to the client or third person any funds or other property that the client or third person is entitled to receive and, upon request by the client or third person, shall render promptly a full accounting regarding such property.

(e) When a lawyer in the course of representing a client is in possession of property in which two or more persons (one of whom

sponsibility Regarding Nonlawyer Assistants),[8] 5.4 (Profes-

---

may be the lawyer) claim interests, the property shall be kept separate by the lawyer until the dispute is resolved. The lawyer shall distribute promptly all portions of the property as to which the interests are not in dispute.

**8.** Rule 5.3 provides:

With respect to a nonlawyer employed or retained by or associated with a lawyer:

(a) a partner, and a lawyer who individually or together with other lawyers possesses comparable managerial authority in a law firm shall make reasonable efforts to ensure that the firm has in effect measures giving reasonable assurance that the person's conduct is compatible with the professional obligations of the lawyer;

(b) a lawyer having direct supervisory authority over the nonlawyer shall make reasonable efforts to ensure that the person's conduct is compatible with the professional obligations of the lawyer;

(c) a lawyer shall be responsible for conduct of such a person that would be a violation of the Maryland Lawyers' Rules of Professional Conduct if engaged in by a lawyer if:

(1) the lawyer orders or, with the knowledge of the specific conduct, ratifies the conduct involved; or

(2) the lawyer is a partner or has comparable managerial authority in the law firm in which the person is employed, or has direct supervisory authority over the person, and knows of the conduct at a time when its consequences can be avoided or mitigated but fails to take reasonable remedial action; and

(d) a lawyer who employs or retains the services of a nonlawyer who (i) was formerly admitted to the practice of law in any jurisdiction and (ii) has been and remains disbarred, suspended, or placed on inactive status because of incapacity shall comply with the following requirements:

(1) all law-related activities of the formerly admitted lawyer shall be (A) performed from an office that is staffed on a full-time basis by a supervising lawyer and (B) conducted under the direct supervision of the supervising lawyer, who shall be responsible for ensuring that the formerly admitted lawyer complies with the requirements of this Rule.

(2) the lawyer shall take reasonable steps to ensure that the formerly admitted lawyer does not:

(A) represent himself or herself to be a lawyer;

(B) render legal consultation or advice to a client or prospective client;

(C) appear on behalf of or represent a client in any judicial, administrative, legislative, or alternative dispute resolution proceeding;

(D) appear on behalf of or represent a client at a deposition or in any other discovery matter;

(E) negotiate or transact any matter on behalf of a client with third parties;

sional Independence of a Lawyer),[9] 5.5 (Unauthorized Practice of Law),[10] and 8.4 (Misconduct).[11]

---

(F) receive funds from or on behalf of a client or disburse funds to or on behalf of a client; or

(G) perform any law-related activity for (i) a law firm or lawyer with whom the formerly admitted lawyer was associated when the acts that resulted in the disbarment or suspension occurred or (ii) any client who was previously represented by the formerly admitted lawyer.

(3) the lawyer, the supervising lawyer, and the formerly admitted lawyer shall file jointly with Bar Counsel (A) a notice of employment identifying the supervising lawyer and the formerly admitted lawyer and listing each jurisdiction in which the formerly admitted lawyer has been disbarred, suspended, or placed on inactive status because of incapacity; and (B) a copy of an executed written agreement between the lawyer, the supervising lawyer, and the formerly admitted lawyer that sets forth the duties of the formerly admitted lawyer and includes an undertaking to comply with requests by Bar Counsel for proof of compliance with the terms of the agreement and this Rule. As to a formerly admitted lawyer employed as of July 1, 2006, the notice and agreement shall be filed no later than September 1, 2006. As to a formerly admitted lawyer hired after July 1, 2006, the notice and agreement shall be filed within 30 days after commencement of the employment. Immediately upon the termination of the employment of the formerly admitted lawyer, the lawyer and the supervising lawyer shall file with Bar Counsel a notice of the termination.

9. Rule 5.4 provides:

(a) A lawyer or law firm shall not share legal fees with a nonlawyer, except that:

(1) an agreement by a lawyer with the lawyer's firm, partner, or associate may provide for the payment of money, over a reasonable period of time after the lawyer's death, to the lawyer's estate or to one or more specified persons;

(2) a lawyer who purchases the practice of a lawyer who is deceased or disabled or who has disappeared may, pursuant to the provisions of Rule 1.17, pay the purchase price to the estate or representative of the lawyer.

(3) a lawyer who undertakes to complete unfinished legal business of a deceased, retired, disabled, or suspended lawyer may pay to that lawyer or that lawyer's estate the proportion of the total compensation which fairly represents the services rendered by the former lawyer;

(4) a lawyer or law firm may include nonlawyer employees in a compensation or retirement plan, even though the plan is based in whole or in part on a profit-sharing arrangement; and

(5) a lawyer may share court-awarded legal fees with a nonprofit organization that employed, retained or recommended employment of the lawyer in the matter.

(b) A lawyer shall not form a partnership with a nonlawyer if any of the activities of the partnership consist of the practice of law.

(c) A lawyer shall not permit a person who recommends, employs, or pays the lawyer to render legal services for another to direct or regulate the lawyer's professional judgment in rendering such legal services.

(d) A lawyer shall not practice with or in the form of a professional corporation or association authorized to practice law for a profit, if:

(1) a nonlawyer owns any interest therein, except that a fiduciary representative of the estate of a lawyer may hold the stock or interest of the lawyer for a reasonable time during administration;

(2) a nonlawyer is a corporate director or officer thereof or occupies the position of similar responsibility in any form of association other than a corporation; or

(3) a nonlawyer has the right to direct or control the professional judgment of a lawyer.

**10.** Rule 5.5 provides:

(a) A lawyer shall not practice law in a jurisdiction in violation of the regulation of the legal profession in that jurisdiction, or assist another in doing so.

(b) A lawyer who is not admitted to practice in this jurisdiction shall not:

(1) except as authorized by these Rules or other law, establish an office or other systematic and continuous presence in this jurisdiction for the practice of law; or

(2) hold out to the public or otherwise represent that the lawyer is admitted to practice law in this jurisdiction.

(c) A lawyer admitted in another United States jurisdiction, and not disbarred or suspended from practice in any jurisdiction, may provide legal services on a temporary basis in this jurisdiction that:

(1) are undertaken in association with a lawyer who is admitted to practice in this jurisdiction and who actively participates in the matter;

(2) are in or reasonably related to a pending or potential proceeding before a tribunal in this or another jurisdiction, if the lawyer, or a person the lawyer is assisting, is authorized by law or order to appear in such proceeding or reasonably expects to be so authorized;

(3) are in or reasonably related to a pending or potential arbitration, mediation, or other alternative dispute resolution proceeding in this or another jurisdiction, if the services arise out of or are reasonably related to the lawyer's practice in a jurisdiction in which the lawyer is admitted to practice and are not services for which the forum requires pro hac vice admission; or

(4) are not within paragraphs (c)(2) or (c)(3) and arise out of or are reasonably related to the lawyer's practice in a jurisdiction in which the lawyer is admitted to practice.

(d) A lawyer admitted in another United States jurisdiction, and not disbarred or suspended from practice in any jurisdiction, may provide legal services in this jurisdiction that:

Pursuant to Rule 16–757,[12] in an order dated October 20, 2011, we referred the petition to Judge Kathleen Gallogly Cox

(1) are provided to the lawyer's employer or its organizational affiliates and are not services for which the forum requires pro hac vice admission; or

(2) are services that the lawyer is authorized to provide by federal law or other law of this jurisdiction.

**11.** Rule 8.4 provides:

It is professional misconduct for a lawyer to:

(a) violate or attempt to violate the Maryland Lawyers' Rules of Professional Conduct, knowingly assist or induce another to do so, or do so through the acts of another;

(b) commit a criminal act that reflects adversely on the lawyer's honesty, trustworthiness or fitness as a lawyer in other respects;

(c) engage in conduct involving dishonesty, fraud, deceit or misrepresentation;

(d) engage in conduct that is prejudicial to the administration of justice;

(e) knowingly manifest by words or conduct when acting in a professional capacity bias or prejudice based upon race, sex, religion, national origin, disability, age, sexual orientation or socioeconomic status when such action is prejudicial to the administration of justice, provided, however, that legitimate advocacy is not a violation of this paragraph;

(f) state or imply an ability to influence improperly a government agency or official or to achieve results by means that violate the Maryland Lawyers' Rules of Professional Conduct or other law; or

(g) knowingly assist a judge or judicial officer in conduct that is a violation of applicable rules of judicial conduct or other law.

**12.** Rule 16–757 provides:

(a) **Generally.** The hearing of a disciplinary or remedial action is governed by the rules of evidence and procedure applicable to a court trial in a civil action tried in a circuit court. Unless extended by the Court of Appeals, the hearing shall be completed within 120 days after service on the respondent of the order designating a judge. Before the conclusion of the hearing, the judge may permit any complainant to testify, subject to cross-examination, regarding the effect of the alleged misconduct. A respondent attorney may offer, or the judge may inquire regarding, evidence otherwise admissible of any remedial action undertaken relevant to the allegations. Bar Counsel may respond to any evidence of remedial action.

(b) **Burdens of proof.** The petitioner has the burden of proving the averments of the petition by clear and convincing evidence. A respondent who asserts an affirmative defense or a matter of mitigation or extenuation has the burden of proving the defense or matter by a preponderance of the evidence.

of the Circuit Court for Baltimore County for a hearing.[13]

Judge Cox heard testimony from Ms. Bogarosh, Mr. Butler, and Chapman himself, and, thereafter, issued the following Memorandum Opinion, in which she determined that Chapman violated Rules 1.4, 5.3, 5.4,[14] and 8.4, but did not violate Rules 1.1, 1.3, 1.5, 1.15, and 5.5:

### Memorandum Opinion

This matter came before the Court for hearing on April 23, 2012, on the Petition for Disciplinary Action filed against Gerald F. Chapman. The Court has considered the testimony and evidence presented, together with post-trial submissions and arguments of Mr. Chapman and the Attorney

---

(c) **Findings and conclusions.** The judge shall prepare and file or dictate into the record a statement of the judge's findings of fact, including findings as to any evidence regarding remedial action, and conclusions of law. If dictated into the record, the statement shall be promptly transcribed. Unless the time is extended by the Court of Appeals, the written or transcribed statement shall be filed with the clerk responsible for the record no later than 45 days after the conclusion of the hearing. The clerk shall mail a copy of the statement to each party.

(d) **Transcript.** The petitioner shall cause a transcript of the hearing to be prepared and included in the record.

(e) **Transmittal of record.** Unless a different time is ordered by the Court of Appeals, the clerk shall transmit the record to the Court of Appeals within 15 days after the statement of findings and conclusions is filed.

13. After Chapman was served with the Petition for Disciplinary or Remedial Action but before the hearing before Judge Cox, Chapman filed a "Trial Memorandum" in which he argued that the Petition should have been dismissed because it was so vague as to deny him due process of law. Judge Cox treated the memorandum as a motion to dismiss, which she denied. Chapman did not renew his objections in any written exceptions before us and, therefore, pursuant to Rule 16– 759, we shall not address this basis for dismissal of the Petition. *See also Attorney Grievance v. De La Paz*, 418 Md. 534, 552, 16 A.3d 181, 192 (2011).

14. The Findings of Fact and Conclusions of Law contain a typographical error in which Rule 5.4 is referred to as Rule 5.3 in the concluding sentence of the Section titled "G. MRPC 5.4." It is obvious from the discussion contained in that Section that the hearing judge intended to refer to Rule 5.4.

Grievance Commission. Pursuant to Maryland Rule 16–757, the Court makes the following findings of fact and conclusions of law.

## I. Findings of Fact

The facts giving rise to this Petition all stem from a consulting arrangement between the Respondent, Gerald F. Chapman, and JW Capital to do loan modification work. The only testimony concerning the law firm structure and the implementation of that consulting relationship came from Mr. Chapman himself. The only other testimony produced at the hearing was from two clients who filed complaints regarding services they received, as supplemented by Mr. Chapman's files concerning those representations. Given the evidence presented, the factual background giving rise to the Petition is really not in dispute.

## A. Facts Pertaining to Mr. Chapman's Legal Practice

The Respondent, Gerald F. Chapman, graduated from the University of Baltimore School of Law and was admitted to practice law in Maryland in 1978. Mr. Chapman has not been the subject of any prior disciplinary proceedings.

Throughout the early phases of his career, Mr. Chapman worked in the banking industry. He worked prior to law school as a bank examiner. Following his admission to practice, Mr. Chapman became an enforcement attorney with the Federal Home Loan Bank Board ("the FHLBB"), which regulates thrift institutions. He served as the deputy director of enforcement for the FHLBB from 1981 through 1985, when he left to become the vice president of Vista Federal Bank in Reston, Virginia. Mr. Chapman left that position to become the president of City National Bank in Washington, D.C. in 1992. Thus he had extensive experience within the banking industry before entering private practice.

Mr. Chapman joined the law firm of Cooter, Mangold, Tompert & Chapman, LLC in 1993 as a partner in their commercial litigation practice. He remained with that firm until 1998, doing primarily commercial litigation and some

transactional real estate and corporate work. In 1998, Mr. Chapman became a solo practitioner, operating as the Chapman Law Group LLC ("the Firm"). The majority of his practice involves commercial real estate transactions, particularly the purchase, sales, and leases for shopping centers and other commercial parcels, with some associated litigation practice.

In approximately 2007 or 2008, following the dramatic decrease in commercial real estate work, Mr. Chapman's practice expanded to include loan modification work that was initially referred to him through existing clients. In contrast to his prior commercial practice, this work was mostly residential.

The loan modification work increased, as residential defaults "skyrocketed" in the 2008–2009 time frame. In Mr. Chapman's experience, lenders were inundated with modification requests, and navigating the process was a challenge. He noted that lenders were "understaffed, overworked, and started to compartmentalize." It was particularly difficult to deal with the same person within a bank, or to get a consistent approach or a response to a modification request. Around 2008, Mr. Chapman became acquainted with James Weiskerger, who was also regularly involved in loan modification work. Mr. Weiskerger is not a lawyer. Mr. Chapman indicated he believed Mr. Weiskerger had a good reputation in the loan modification field. Following several meetings and discussions concerning mutual business opportunities, the two agreed to enter into a consultant agreement. Mr. Chapman testified that he did not consider loan modification work to be legal work. He also readily acknowledged that a major impetus for the arrangement was a change in the law that prohibited non-lawyers from collecting fees up front for loan modification work. In his opinion these new provisions expressly excluded lawyers from this prohibition. Therefore he discussed a business arrangement with Mr. Weiskerger where Mr. Chapman's firm would manage the loan modification work, utilizing Mr.

Weiskerger's firm, JW Capital, LLC ("JW Capital"), as a consultant.

Ultimately, a Consulting Agreement was executed on November 1, 2008 between JW Capital and the Chapman Firm. Pursuant to that Agreement, JW Capital was to use its best efforts to secure clients for the Chapman Firm. The agreement specifically provided, "In the event that the Consultant shall use the Firm's name in connection with any advertising or solicitation, Consultant agrees to clear such advertising or solicitation in advance with Client [sic]." In addition, the Agreement contemplated that JW Capital would have potential clients execute a retainer agreement for a fixed fee arrangement for representation by the Chapman Firm. Specifically, the Agreement states:

> The Retainer Agreement shall contain a lump sum fixed price which shall be for services to be rendered by the Firm as well as the fees which the Firm will pay to the Consultant for its Services to the Firm for the benefit of the client. The Retainer Agreement shall set forth the manner of payment of any fees by the Client. All fees collected from any Clients shall be promptly deposited into the Firm's escrow trust fund checking account, and such fees as to which Consultant shall be entitled for its services shall be paid to Consultant by the Firm after the deposits have fully cleared. At the time that Consultant submits the initial Retainer Agreement, Consultant shall set forth on a separate form the amount of the retainer and any proposed fee that Consultant intends to charge for its Services.

Pursuant to the Agreement, the Chapman Firm agreed to utilize the services of JW Capital "to the extent that the Firm deems it in the best interests of the Client. . . ." Additionally, the Agreement outlined that the Firm and the Consultant shall meet at least weekly to review and discuss the status of each case referred to the Consultant. Mr. Chapman acknowledged that he managed the Chapman Firm out of a home office in Bethesda, but the loan modification work was done in Baltimore. The rent for that office

was paid by JW Capital or an affiliated entity. The periodic case reviews were conducted at the Baltimore office. The unrefuted testimony from Mr. Chapman was that he met weekly with Mr. Weiskerger to go over their caseload, talk about any problems, and discuss files that needed review. He also testified they were in regular email communication. Mr. Chapman emphasized that he encouraged Mr. Weiskerger to minimize phone communications with clients, and to utilize email to create a paper trail of actions taken in the representation. Mr. Chapman testified that he believed Mr. Weiskerger did an excellent job keeping him informed.

Mr. Chapman testified that the consulting arrangement with JW Capital began in November 2008. He stopped the consulting arrangement and wound down the loan modification following the complaints giving rise to this Petition. During those two years, Mr. Chapman estimated the Firm handled loan modifications for as many as 200 clients, and generated gross revenues of approximately $300,000. He believed that many of their clients came through referrals from prior clients. He also testified that his firm satisfactorily resolved 95–98% of these matters.

At the time the consulting Agreement was implemented, Mr. Chapman and Mr. Weiskerger agreed to price the work around $1,500 for a loan modification, out of which JW Capital would receive $1,300 as a consulting fee, and the Chapman Firm would receive the remaining $200. The Retainer Agreement was structured so fees were due up front, or in a series of installments paid in the beginning of the representation. In Mr. Chapman's opinion, anyone doing loan modification work without getting a fee in advance was "crazy." His practice was to deposit the check for fees into the Firm's escrow account, and then pay the consulting fee to JW Capital after the check cleared.

Mr. Chapman stated he reviewed applicable statutes and the professional conduct rules before entering this arrangement. In his view, Mr. Weiskerger and JW Capital were not doing legal work, and he was paying them for the consulting services they provided for clients they secured.

## B. The Bogarosh Loan Modification

Barbara Bogarosh employed the Chapman Firm to assist with a loan modification. Ms. Bogarosh testified that she was delinquent on the mortgage on her home as a result of various financial strains. In part, she was unemployed for a period, she was unable to work while caring for a disabled parent out of state for another period, and she was caught up in a familial dispute regarding guardianship for her father. Although she was initially interested in pursuing a modification when she was unable to meet her payment obligation, her financial situation changed following the death of her father and the resolution of his estate. Ms. Bogarosh was aware she would inherit funds that would enable her to bring her mortgage current. However she was still interested in pursuing a loan modification to restructure the debt and reduce her payments.

Initially Ms. Bogarosh spoke to her lender's attorney at Shapiro and Burson. When she explained that she wanted to secure a loan modification, she was told she may qualify for certain modification programs. After looking for resources on various websites, she contacted the Chapman Law Group, whom she understood to be doing business as "Keep Our Homes." She contacted the firm by phone and by email and eventually spoke to James Weiskerger. Ms. Bogarosh could not recall what Mr. Weiskerger represented his position to be within the firm, but she was aware he was not a lawyer. Mr. Chapman utilized business cards for the Chapman Firm, with information for both the Bethesda and Baltimore offices. Those cards identified Mr. Weiskerger as a "Senior Consultant". Ms. Bogarosh was told the Firm was experienced in loan modifications. However, unlike other groups, she was told they had an attorney as part of the group. Ms. Bogarosh met with Mr. Weiskerger, checked two of his three references, and eventually agreed to hire the Firm. Ms. Bogarosh had prior experience with foreclosure and loan modification, as she had faced foreclosure on the same property in 2007. She discussed her current situation with Mr. Weiskerger and understood it

was not clear whether she would qualify for a modification, based upon her projected inheritance following her father's death. Although she discussed the possibility of simply paying the delinquent amount, as she would have the funds to do so, she understood Mr. Weiskerger counseled against that course of action, as she could buy a comparable property for less money in the current market. Therefore, she agreed to pursue loan modification.

On October 19, 2009, Ms. Bogarosh signed a retainer agreement, and agreed to pay a fixed fee of $1,500, to be paid in three installments, for assistance with the loan modification. The retainer agreement with the Chapman Firm was executed and returned to the firm. Ms. Bogarosh said it was a critical factor to her that she was dealing with a law firm, as other groups she talked to were simply debt consolidation firms.

Ms. Bogarosh had no direct communications with Mr. Chapman. Primarily she dealt with Mr. Weiskerger or one of the assistants who worked for him. Ms. Bogarosh paid the initial retainer fee of $500, and the follow up first installment.

At the outset of the representation, a foreclosure sale was set for Ms. Bogarosh's home on January 6, 2010. That foreclosure was postponed, and the Firm continued to try to get her loan restructured. A second foreclosure sale was set for April 28, 2010, and was again postponed. Ms. Bogarosh communicated with Mr. Weiskerger and his assistants primarily through emails. As the process continued, Ms. Bogarosh expressed concern that there seemed to be a lot of delay, and nothing was finalized. In addition, the home was in need of some substantial repairs, yet she was uneasy about investing money in repairs if the house would be lost to foreclosure.

Starting around April 2010, Ms. Bogarosh testified that she started to leave frequent messages at the Firm but often did not receive a response. She stated she never got a live answer, but had to resort to voice messages and email.

After the April 2010 foreclosure was postponed, Ms. Bogarosh was told the Firm would prepare a Statement of Facts on her behalf, and that might help resolve the impasse with the bank. During the summer of 2010, Ms. Bogarosh testified generally about frustration with the lack of progress. Her initial contact person, Rebecca Eberwein, was no longer involved, and she was then communicating with Katie Ricketts, both of whom worked for Mr. Weiskerger. She testified that she was asked for duplicates of information previously provided, and she seemed to have to repeat the production of information previously sent to the Firm.

During her representation by the Firm, Ms. Bogarosh secured a new cell phone number. She communicated the new number to the Firm through phone and email messages, on more than one occasion.

On August 3, 2010, Ms. Bogarosh received notice that a third foreclosure date was set for August 11, 2010. She forwarded this information to the Firm by email on August 3, 2010 at 12:20 p.m., asking, "Can U make certain this is stopped?" In response to requests for additional documentation on August 4, 2010, she responded to Katie Ricketts the following day, reiterating her employment status and the documentation previously provided. She then stated:

> Again, I want to meet with you and James. I feel like I keep saying and sending the same things over and over and over again & no one seems to be seeing the documents or putting the whole picture together. If we meet in person, I can hand hold U through all the documents & U can know that U have everything. . . .

On August 9, 2010, Ms. Bogarosh contacted the foreclosure attorneys directly seeking a postponement of the sale based upon the pending modification request with the Chapman Firm. She again emailed the Firm noting the pending foreclosure stating, **"Please take care of this."** (Emphasis in original.) She sent a follow up email to James Weiskerger on August 9, 2010 at 4:53 p.m. stating:

Have spent the last hour on the phone with 5 different people at PHH—and I still do not have an indication that the house has been removed from the foreclosure sale list. Can U please take care of this? I can't get through to U directly. I can't understand why this was not taken care of last week. We need to talk. Barbara

A similar, urgent email was forwarded to the Firm, with a copy to Mr. Weiskerger on August 10 at 9:08 a.m., stating in pertinent part:

·This is the third time I've produced the same documents, albeit updated. Again, I want to meet with James (who I hired to do this) and you so that we have a time line and a game plan where we are all on the same page. I thought we were on the same page last April, but it appears things have spun out of control again. Pls suggest some times when we can meet. I really want to move this process to the finish line & now that we have PHH's attn, let's do it.

Later at 6:18 p.m. on August, 9, 2010, Ms. Bogarosh received a follow up from Katie Ricketts as follows:

I contacted the bank. Fortunately, they have received the documents we sent them, and they have been uploaded into the system.... The representative I spoke with, Mr. Joe Pennah, made a request to have a hold placed on your sale date so as to allow the bank enough time to review your file. Due to your pending sale date, this request was made with priority.

I have been advised to call back tomorrow and make certain that the request for the hold on your sale date has gone through. Please check your email frequently tomorrow as I plan to call upon your file many times. I will be following up with you via email.

Ms. Bogarosh testified she tried, without success, to get confirmation of postponement from the bank the next morning, but was told the request was still pending.

The next email produced from The Chapman Firm is dated August 10, 2010 at 6:23 p.m. from Katie Ricketts stating:

Please confirm that you have filed a chapter 13 bankruptcy with Crystal Barnett in order to stop your sale date. Also; the only number we have on file for you is 240–4400–0079[sic]. I have been calling this number but it does not work. Please let me know a number where you can be reached.

Again, please file a Chapter 13 Bankruptcy with Crystal. Time is of the essence.

Upon receipt the next day, Ms. Bogarosh responded at 10:59 a.m.:

I picked up your emails this morning. I've called Crystal, but she is busy. It think it is too late. I am just unspeakably angry about this. This should have been taken care of last week. I would have had time to file BR had I known you'd not been vigilant in guarding my interests.

Three minutes later, Katie responded that the Firm typically does not advise to file bankruptcy until the evening before the foreclosure, as they see it as a last option. She then provided names of possible firms for use.

The foreclosure sale occurred as scheduled on August 11, 2010. Later communications from Ms. Bogarosh that day, and in the ensuing couple of days, simply reiterated the breakdown that occurred. As documented in prior emails, she had communicated and verified a new phone number months before the August foreclosure date. Her frustration is summarized in her email from August 11, 2010 at 11:43 a.m.:

I have called CLG multiple times in the last 10 days and left my phone number, 240.444.0178, but no one returns my calls. It is too late. The foreclosure sale time has passed. My understanding is that once the house is sold, bankruptcy law cannot save it. If U know differently, tell me. I've filed Chap. 13 before to save the house from

foreclosure & could have done it this time, if you'd been on top of this & I'd heard from you earlier. You have your own inhouse lawyer, yes? Why didn't you pass this to Gerald Chapman? Could he not have filed on my behalf at the last minute? Does he think filing Chap. 13 now would save the house from the hands of a buyer who has just purchased?

Ms. Bogarosh reiterated she could have paid the arrearages in August to avoid foreclosure. She acknowledged that she was never guaranteed that she would obtain a modification, but she felt she was led to believe the process would be relatively easy. Until the date of the actual sale, bankruptcy was not discussed, and in her mind, it was not an option based upon the inheritance she received.

At the hearing, Mr. Chapman expressed that he was "aghast" at the Bogarosh situation. Mr. Chapman stopped doing modification work within thirty days after learning what occurred. However he noted that 95% of the time, in his experience, foreclosures are not postponed until the day before they are set. In most instances, he found that postponements occurred when modification requests were pending.

Mr. Chapman contended Ms. Bogarosh had to have been aware that bankruptcy was an alternative, as she had followed that course in the past. Based upon his file review, the problem occurred because Ms. Bogarosh's new telephone number was not properly logged into their system. The "overwhelming majority" of their communications with her were by email, but by the time she reviewed the critical email to pursue bankruptcy, it was too late. Efforts to communicate by phone were ineffective since the wrong number was still maintained for her. While not excusing the miscommunication and resulting foreclosure that could have been avoided, Mr. Chapman essentially contended it was an isolated failure.

## C. The Butler Loan Modification

During the fall of 2009, John Butler was in default on four of the seven properties he owned in Maryland. He was

referred to Mr. Weiskerger by his sister, who was also attempting to obtain a loan modification. Following an initial meeting, Mr. Butler signed a retainer agreement on October 19, 2009, and agreed to pay $4,500 for assistance to modify the loans on all four delinquent properties. He paid $3,375, which was all but the final installment of that fee.

Mr. Butler communicated directly with Mr. Chapman on only one occasion concerning an unrelated suit in Prince George's County. Mr. Chapman suggested he should get an attorney in the county to handle that matter. All communications concerning the loan modification were with Mr. Weiskerger or his assistant. Mr. Butler claims he was told to stop making payments on his loans. Essentially he was told that if he demonstrated he was able to pay the loans, it would delay the modification process.

Mr. Chapman adamantly denied it was the practice of the Firm to advise clients not to pay their mortgages. He testified that he harped on this with Mr. Weiskerger, stating the Firm had an absolute policy not to tell clients to stop paying their mortgages. He also indicated he spoke to both of Mr. Weiskerger's assistants on numerous occasions to reiterate this policy.

Mr. Butler received numerous requests for information concerning the loan modifications, and he responded promptly with the requested information. Eventually he was referred by Mr. Weiskerger to an attorney to file bankruptcy to stop the foreclosure process. Ultimately, he filed for bankruptcy in May 2010.

Throughout the process, Mr. Butler was frustrated by repeated requests for duplicate information. At one point, out of frustration, he faxed information, mailed a duplicate copy, and called to confirm.

As of August 2010, the Firm was unsuccessful in obtaining loan modifications for any of the Butler properties. Rather they recommended that he attempt to sell at least one of the properties with some equity, and utilize the proceeds to reduce his debt and then see if he qualified for modification.

The major impediment to obtaining the modifications for Mr. Butler was his credit card debt. Mr. Butler testified he was never advised that his credit card debt would prevent him from obtaining a loan modification. He acknowledged that he was advised that short sales of the properties were probably his best option, but he noted that he did not owe much more than the fair market value for at least some of the properties, so he did not want to pursue that option.

Ultimately Mr. Butler believed the Firm did not assist with his difficulties. Mr. Butler stated he would not have engaged the firm if he was aware that he had too much credit card debt to qualify for a loan modification. Mr. Butler eventually filed a complaint with the Attorney Grievance Commission.

Mr. Chapman testified that Mr. Butler's file reflects that his credit card debt eventually posed an insurmountable difficulty. An initial tally faxed from Mr. Butler on November 3, 2009 listed nearly $72,000 in credit card debt.

### D. Facts in Mitigation

Following receipt of the complaints concerning the Bogarosh and Butler properties, Mr. Chapman wound down his loan modification work. He estimated that a portion of his practice was concluded within thirty days.

Mr. Chapman was candid in his assessment that the communication with Ms. Bogarosh was mishandled, and the house should not have been lost to foreclosure when Ms. Bogarosh had funds to pay the deficiency. He testified generally that it is the nature of loan modification work that foreclosure dates are pulled at the last minute, and that it is difficult to get a definitive answer from a bank. He also testified that the use of bankruptcy proceedings at the last minute to stop a sale is a practice that is employed, but it is done as a last resort. He did not try to justify the Bogarosh lapse on this basis, but did try to explain the reason activities seem to stall, and then snowball.

Mr. Chapman refunded the $1,500 fee to Ms. Bogarosh. He also refunded $2,000 to Mr. Butler. Finally, these do

appear to be isolated failures. Mr. Chapman testified that he believed his firm successfully negotiated loan modifications for approximately 95% of the clients that engaged their services.

## II. Legal Analysis

The Attorney Grievance Commission contends that it presented clear and convincing evidence that Mr. Chapman violated Rules 1.1, 1.3, 1.4, 1.5, 1.15, 5.3, 5.4, 5.5 and 8.4 of the Maryland Rules of Professional Conduct ("MRPC") in his representation of Ms. Bogarosh, and that he violated all of the same, with the exception of Rule 1.1, in his representation of Mr. Butler.

### A. MRPC 1.1

MRPC 1.1 provides:

> A lawyer shall provide competent representation to a client. Competent representation requires the legal knowledge, skill, thoroughness and preparation reasonably necessary for the representation.

The Commission contends that Mr. Chapman failed to provide competent representation to Ms. Bogarosh, essentially arguing that he provided no legal services whatsoever by delegating to others. In addition, the Commission argues Ms. Bogarosh should have been advised earlier that she may need to file for bankruptcy to delay the foreclosure proceeding. In response, Mr. Chapman argues that he retained JW Capital to provide consulting services, and that they diligently pursued the loan modification on behalf of Ms. Bogarosh. Further, he argues Ms. Bogarosh was well aware of the bankruptcy option, as she had pursued that approach in an earlier loan modification.

The evidence presented does not support a finding, by clear and convincing evidence, that the representation was not competent. Curiously, throughout these proceedings, there was no evidence of any different strategy or approach that should have been employed. Clearly the nature of the loan modification practice is a labor intensive effort to present information to a bank to endeavor to persuade it not

to pursue foreclosure and to modify the terms of an existing loan. There was no testimony that Ms. Bogarosh qualified for a modification option that was not pursued. Similarly, there was no evidence that the bank's failure to grant the modification request, or its failure to grant the request to delay the foreclosure sale were based upon some fault or neglect in the manner this was pursued. In fact, review of the Chapman Firm file for this representation documents regular follow up with the bank by the JW Capital associate, generally on a weekly basis, in an attempt to advance the efforts. JW Capital appears to have taken the appropriate steps to seek modification. The simple fact that a modification was not obtained does not necessarily imply a lack of competence in the pursuit. This allegation is simply not supported by the evidence.

**B. MRPC 1.3**

MRPC 1.3 provides:

> A lawyer shall act with reasonable diligence and promptness in representing a client.

The Commission argues that Mr. Chapman failed to act with reasonable diligence and promptness in pursing the Bogarosh and Butler loan modifications. In the Bogarosh matter, they point primarily to the ten month delay, with no result. In the Butler matter, they argue that Mr. Butler would not have continued to pursue representation if he had been told that credit card debt was an impediment.

The Court does not find clear and convincing evidence of a violation of MRPC 1.3. The fact that the Firm was unable to achieve a desired outcome is not, in and of itself, evidence of a lack of diligent pursuit. As noted above, the Firm files from both the Bogarosh and the Butler representations clearly document a persistent series of contacts with lenders in an effort to advance the modification requests.

Fundamentally, neither of these cases presented circumstances where the client was entitled to the requested relief. Both clients acknowledged they were told at the outset that the Firm could not guarantee they would receive a loan

modification. It is the nature of the foreclosure and loan modification practice that even diligent efforts are thwarted at times by a lack of response from a lending institution, or by their failure to negotiate a modification, even in the face of a persuasive request. Again, lack of diligence is not adequately demonstrated on this record.

## C. MRPC 1.4

MRPC 1.4 provides:

(a) A lawyer shall: ...

(2) keep the client reasonably informed about the status of the matter;

(3) promptly comply with reasonable requests for information; and

(b) A lawyer shall explain a matter to the extent reasonably necessary to permit the client to make informed decisions regarding the representation.

The Commission contends that Mr. Chapman violated MRPC 1.4 in that he failed to respond to requests for information, and to return calls from clients. In the Bogarosh matter, the Commission argues she was not timely advised that the foreclosure sale in August 2010 remained pending, or given sufficient time to pursue bankruptcy. In the Butler matter, the Commission argues he was not timely advised of the difficulties posed by his consumer debt.

In the Butler matter, the Court does not find clear and convincing evidence of a failure to respond to requests for information or to return calls. In fact, Mr. Butler acknowledged that he spoke repeatedly with Mr. Weiskerger. While Mr. Butler denies he was advised that his consumer debt was an impediment to the modification, that recollection seems inconsistent with the strategy he acknowledges that the Firm advised him to employ, which included a bankruptcy petition to eliminate some of the debt. It also seems inconsistent with the acknowledged recommendation to pursue a sale of one or more of his properties.

In the Bogarosh matter, the records clearly document key lapses in timely communication in late July and August

2010. As detailed above, as the August 2010 foreclosure date approached, Ms. Bogarosh clearly and repeatedly requested a meeting to discuss the status of her case and the strategy. She also clearly communicated her new telephone number which was never recorded in the firm's system. During the most critical time frame, on a day when Katie Ricketts acknowledged in an email that she may be in frequent communication, and later acknowledged that she tried repeatedly to call, the inability to communicate was caused by the consultants acting for the Firm. Of greater concern, despite repeated requests to schedule a meeting, there was no response by the Firm. Throughout the critical time frame, Ms. Bogarosh's only substantive communications were with the support staff for the Firm's consultant.

Mr. Chapman argues Ms. Bogarosh should have been well aware of the possibility of a bankruptcy filing at the last minute, based upon her prior experience. Clearly her financial circumstances were different in 2010 than at the time of her prior bankruptcy, as she had an inheritance and an ability to pay the deficiency on the property. It is not at all clear that a bankruptcy petition could have been filed in good faith in 2010. Clearly there was no communication concerning the possibility of filing bankruptcy in a timely manner so it could have been pursued by the client. Thus the Court finds that Mr. Chapman violated MRPC 1.4 in his representation in the Bogarosh matter based upon the failure to timely communicate with the client and the failure to respond to requests to meet in the late July and August 2010 time frame.

## D. MRPC 1.5

MRPC 1.5 provides:

> (a) A lawyer shall not make an agreement for, charge, or collect an unreasonable fee or an unreasonable amount for expenses. The factors to be considered in determining the reasonableness of a fee include the following:

(1) the time and labor required, the novelty and diffi-culty of the questions involved, and the skill requisite to perform the legal service properly;

(2) the likelihood, if apparent to the client, that the acceptance of the particular employment will preclude other employment of the lawyer;

(3) the fee customarily charged in the locality for simi-lar legal services;

(4) the amount involved and the results obtained;

(5) the time limitations imposed by the client or by the circumstances;

(6) the nature and length of the professional relation-ship with the client;

(7) the experience, reputation, and ability of the lawyer or lawyers performing the services; and

(8) whether the fee is fixed or contingent.

The Commission argues the fees charged in these matters were unreasonable, as no legal services were provided. The Court is not persuaded by this argument. Clearly signifi-cant work was done in both cases to pursue loan modifica-tions. Whether that work required legal talent or skill is not the issue. The fees charged are not unreasonable, based upon the nature of the work that was anticipated at the time the fee was set. Similarly, they are not unreason-able in light of the efforts undertaken to pursue these matters.

**E. MRPC 1.15**

MRPC 1.15 provides:

(a) A lawyer shall hold property of clients or third persons that is in a lawyer's possession in connection with a representation separate from the lawyer's own proper-ty. Funds shall be kept in a separate account and records shall be created and maintained in accordance with Chapter 600 of the Maryland Rules. Other property shall be identified specifically as such and appropriately safeguarded, and records of its receipt and distribution

shall be created and maintained. Complete records of the account funds and of other property shall be kept by the lawyer and shall be preserved for a period of at least five years after the date the record was created....

(c) Unless the client gives informed consent, confirmed in writing, to a different arrangement, a lawyer shall deposit legal fees and expenses that have been paid in advance into a client trust account and may withdraw those funds for the lawyer's own benefit only as fees are earned or expenses incurred....

The Commission argues Mr. Chapman violated MRPC 1.15 by setting an "up front" fee for the services for Ms. Bogarosh and Mr. Butler. In part, it argues that MRPC 1.15(c) requires written consent from the client to any arrangement other than withdrawal of fees and expenses from an escrow account only after they are earned by the lawyer. Since no successful modification was obtained, the Commission argues the fees were not earned.

This argument is not persuasive. The Retainer Agreements signed by both clients, while not extensive, contain the following language: "The Retainer shall be deemed earned upon receipt by the Firm in light of the commitment in time and resources that the Firm will have to invest in the Retained Matter, because the Firm will be securing the services of one or more consultants and because such retention precludes or limits the Firm's ability to pursue other client matters." Based upon the evidence, including this written agreement, the Court finds that both clients were aware the fee was paid up front, and they consented to that arrangement.

The Commission also argues there was a violation of MRPC 1.15 based upon the timing in which funds, once deemed earned, were paid out from the escrow account. On this issue, there was no evidence to verify when funds were deposited, and when they were actually disbursed. The general practice described by Mr. Chapman was that he waited for the checks to clear, then disbursed $200 for his fee with the balance to JW Capital for their Consulting Fee.

This does not appear to violate MRPC 1.15, given written consent to a fixed fee arrangement that is deemed earned upon receipt.

## F. MRPC 5.3

MRPC 5.3 provides:

With respect to a nonlawyer employed or retained by or associated with a lawyer:

(a) a partner, and a lawyer who individually or together with other lawyers possesses comparable managerial authority in a law firm shall make reasonable efforts to ensure that the firm has in effect measures giving reasonable assurance that the person's conduct is compatible with the professional obligations of the lawyer;

(b) a lawyer having direct supervisory authority over the nonlawyer shall make reasonable efforts to ensure that the person's conduct is compatible with the professional obligations of the lawyer;

(c) a lawyer shall be responsible for conduct of such a person that would be a violation of the Maryland Lawyers' Rules of Professional Conduct if engaged in by a lawyer if:

(1) the lawyer orders or, with the knowledge of the specific conduct, ratifies the conduct involved; or

(2) the lawyer is a partner or has comparable managerial authority in the law firm in which the person is employed, or has direct supervisory authority over the person, and knows of the conduct at a time when its consequences can be avoided or mitigated but fails to take reasonable remedial action; . . .

The Commission essentially argues that Mr. Chapman abdicated his professional responsibility by ceding all responsibility for the loan modification work to Mr. Weiskerger and his associates. In response, Mr. Chapman argues that he established a system to oversee the loan modification work through regular email communication and weekly review meetings.

While I found Mr. Chapman's testimony credible that he and Mr. Weiskerger were in regular communication, and that they met weekly for a half hour or so to discuss matters, there was no evidence that he had any familiarity with either the Bogarosh or the Butler matters until after the complaints were filed. Rather, the testimony demonstrated that Mr. Weiskerger was responsible for generating much, if not all of the loan modification business. He conducted the initial client meetings, he set the strategy, and his associates processed the necessary papers, called the banks, and communicated with the clients. Mr. Chapman had essentially no contact with these clients. Other than isolated instances, he met with none of the loan modification clients and all of the substantive loan modification work was managed and directed by his consultant.

Certainly a firm can engage consultants to assist in representation without violating an ethical obligation. Similarly, lawyers and firms can, and often do delegate responsibility for much of the file or case processing to paralegals or other paraprofessionals. In the latter instance, the lawyer clearly has an ethical obligation to oversee and manage the work delegated to junior lawyers and non-lawyers within an office. The distinction in this case, and the flaw in the arrangement, is that virtually all core case responsibility was ceded to the consultant.

The Consulting Agreement recites that, "at all times, Consultant shall be providing its Services to the Firm and to no third party, including any Client." Similarly, it states, "Consultant shall at all times only be rendering consulting services to the Firm." Had that approach been employed, and the Consultant was called upon to assist in representation, the arrangement would not be problematic. However, the clear reality is that the Consultant obtained the client, staffed the case, directed the approach, and only tangentially updated Mr. Chapman. The fee arrangement underscores the finding that Mr. Chapman's involvement was de minimis. In the standard case, where the fee was set at $1,500, a scant 13%, or $200, was the payment to the Firm.

Given the arrangement between the parties, Mr. Chapman would only learn of problems in cases for his own clients if they were drawn to his attention by his consultant. Although the relationship between Mr. Chapman and JW Capital was described as a Consulting Agreement, the reality is that JW Capital did not "consult" so much as it managed the work from start to finish.

For the foregoing reasons, the Court finds by clear and convincing evidence that the Consulting Agreement, as implemented by Mr. Chapman, violated MRPC 5.3.

### G. MRPC 5.4

MRPC 5.4 provides, in pertinent part, that, "[a] lawyer or law firm shall not share legal fees with a non lawyer[.]" The Commission argues this entire consulting arrangement was simply an improper agreement to share legal fees with a non-lawyer. Somewhat ironically, Mr. Chapman responds that the services JW Capital provided were not legal services, and thus the consulting fees were not legal fees.

Clearly, these clients believed they were engaging the services of a law firm to assist with their foreclosure and loan modification problems. The fees were paid to the law firm, and a reasonable client would believe them to be for services rendered by the law firm. While the firm could consult and pay an appropriate fee to a consultant or expert, this arrangement operated more as a pass through or sharing of the fees obtained for this work to the consultant.

Once again, there may be occasions where a lawyer or firm repeatedly engages an expert to assist in representation, for a flat fee, and the fee for that expert is paid as part of a fixed fee set at the outset of the engagement. If the fees are disclosed and agreed to by the client, there would be no ethical violation. However the flaw in the Chapman arrangement is that, in operation, it really was a payment of $200 per case to run the loan modification work done by JW Capital through the Chapman Firm, thereby avoiding legal requirements that would otherwise be imposed on JW Capital. Regardless of how this arrangement was characterized,

it really was a fee sharing arrangement for work contracted through a law firm, and therefore violated MRPC 5.3.

**H. MRPC 5.5**

MRPC 5.5 provides, in pertinent part, that, "[a] lawyer shall not practice law in a jurisdiction in violation of the regulation of the legal profession in that jurisdiction, or assist another in doing so. . . ." The Commission argues that the consulting arrangement employed by Mr. Chapman enabled Mr. Weiskerger and his assistants to engage in the unauthorized practice of law. The Court does not find clear and convincing evidence to support this claim. In fact, the statutes relied upon by the Commission that seek to limit fee and billing practices for nonlawyers that engage in the precise type of business clearly demonstrate that one is not required to have a law license to provide assistance in this field.

**I. MRPC 8.4**

MRPC 8.4 provides:

It is professional misconduct for a lawyer to:

(a) violate or attempt to violate the Maryland Lawyers' Rules of Professional Conduct, knowingly assist or induce another to do so, or do so through the acts of another;

. . .

(c) engage in conduct involving dishonesty, fraud, deceit or misrepresentation;

(d) engage in conduct that is prejudicial to the administration of justice; . . .

The Commission argues* that Mr. Chapman engaged in conduct involving dishonesty, deceit and misrepresentation in the representation of Ms. Bogarosh and Mr. Butler. In essence, it argues that the provision of services through Mr. Weiskerger and JW Capital, under the guise of representation as a law firm, was a sham. Mr. Chapman defends the practice as a bona fide consulting arrangement that he monitored and supervised within his Firm.

As stated in the discussion above, the arrangement between the parties did mislead clients into believing they

were obtaining representation through a law firm, when in reality JW Capital directed the representation. This Consulting Agreement was also designed to shield JW Capital from the requirements imposed under the Protection of Homeowners in Foreclosure Act ("PHFA"). *See,* Maryland Real Property ("RP") Law, § 7–301 et. seq. A "foreclosure consultant" includes a person who solicits a homeowner to assist to delay or postpone a foreclosure sale, or to assist in refinancing a loan that is in foreclosure and for which a notice of foreclosure has been published. RP § 7–301(c). Clearly the nature of the work done by JW Capital falls within that definition. Unless excluded from coverage under this Act, the PHFA requires a foreclosure consultant to be licensed, and to utilize very specific engagement contract. RP §§ 7–306; 7–308. In addition, a foreclosure consultant is prohibited from receiving compensation until "after the foreclosure consultant has fully performed each and every service the foreclosure consultant contracted to perform or represented that the foreclosure consultant would perform." RP § 7–307(2). However the PHFA specifically excludes "an individual admitted to practice law in the State while performing any activity related to the individual's regular practice of law in the State." RP § 7–302(a)(1).

The Consulting Arrangement enabled JW Capital to avoid the clear statutory requirements for license, contract disclosures, and fees, in exchange for a fee paid to Mr. Chapman, with no expectation that he would directly undertake to direct the work to be done. However earnestly Mr. Chapman believed that arrangement comported with the statutory or his ethical requirements, it operated to misrepresent and mislead clients into believing they engaged the services of a law firm, rather than an unlicensed foreclosure consultant. For that reason, the Court finds clear and convincing evidence of a violation of MRPC 8.4.

## III. Conclusion

Although many of the violations alleged arise out of the substance of the representation of Ms. Bogarosh and Mr. Butler, having considered the testimony and the evidence

presented, professional competence is not, in my view, the major focus of concern. As outlined above, there were clearly lapses in the communication between the Firm and Ms. Bogarosh at a time that was critical and time sensitive. As a result, her home was lost in foreclosure. The outcome was occasioned, in large part, by what appears to be an isolated failure to update firm records with a current phone number. With Mr. Butler, there's no convincing suggestion that the Firm could or should have done something to improve the outcome. It appears that loan modification was not a viable option until Mr. Butler's consumer debt was reduced. This obstacle dictated the strategy that was pursued. The fact that little progress was made does not reflect that the matter was not competently handled. For that reason, the Petitioner dropped its contention that representation in that instance was not competent.

While the lapse in communication with Ms. Bogarosh did rise to the level of an ethical lapse, these problems with the substance of the Firm's representation appear isolated. There is no evidence to suggest a pattern of sub-par representation by the Firm.

The real thrust of the viable grievances derives from the practice of lending the dignity of a law office to help to promote what is, in essence, a non-legal service. Mr. Chapman repeatedly acknowledged that he did not consider the loan modification services done under the auspices of the Firm to be real "legal service." In fact, clearly one is not required to be a lawyer in order to provide loan modification services. However if those services are provided in a setting other than a law firm, the provider must be licensed, and there are restrictions on the ability to require fees to be paid up front.

The business association between Mr. Weiskerger and Mr. Chapman was designed to allow Mr. Weiskerger to continue to provide loan modification services without a license, and to demand fees in advance. Mr. Chapman's involvement served to cloak those services with the aura of a law firm, thereby allowing Mr. Weiskerger to continue in

a manner that would not otherwise be permitted. While there's nothing inherently wrong with a lawyer engaging a consultant, or with passing through a payment of a fee for the reasonable value of those consulting services, the operation in this instance is not that model. It is more akin to payment of a fee by a business for use of the cache of the law firm. The law firm is not much more than a prop to attract business that does not require special legal acumen or skill. Of particular concern in this case, the affiliation with the law firm enabled those non-legal loan modification services to be done by non-lawyers not affiliated with the firm in a manner that would not otherwise be permitted.

While I find that Mr. Chapman researched and attempted to structure an arrangement that complied with statutory and ethical requirements, I believe his judgment was in error. For that reason, and for those detailed above, I find clear and convincing evidence of violations of MRPC 1.4, 5.3, and 8.4.

(internal footnotes omitted).

 "This Court has original and complete jurisdiction over attorney discipline proceedings in Maryland." *Attorney Grievance v. Seltzer*, 424 Md. 94, 112, 34 A.3d 498, 509 (2011), quoting *Attorney Grievance v. Stern*, 419 Md. 525, 556, 19 A.3d 904, 925 (2011). "In our independent review of the record, we accept the hearing judge's findings of fact as prima facie correct unless shown to be clearly erroneous." *Attorney Grievance v. Lara*, 418 Md. 355, 364, 14 A.3d 650, 656 (2011). We conduct an independent review of the hearing judge's conclusions of law pursuant to Rule 16–759(b)(1).[15]

Chapman did not file any exceptions to the hearing judge's findings of fact or conclusions of law, while Bar Counsel excepted to the hearing judge's failure to find violations of Rules 1.5(a) and 1.15(c). Because neither party filed any

---

**15.** Rule 16–759(b)(1) provides:

**Review by Court of Appeals.** (1) Conclusions of law. The Court of Appeals shall review de novo the circuit court judge's conclusions of law.

exceptions to the findings of fact, we accept those findings as proven by clear and convincing evidence under Rule 16–759(b)(2)(A). *Attorney Grievance v. Nelson,* 425 Md. 344, 358, 40 A.3d 1039, 1047 (2012).

Bar Counsel's exception to the hearing judge's conclusion that Chapman did not violate Rule 1.5(a) is premised on Chapman's representation of Ms. Bogarosh, wherein she entered into a retainer agreement with the Chapman Law Group, LLC, that stated that its purpose was for the "advising and counseling [of Ms. Bogarosh] as to appropriate or alternative courses of action as well as attempting to negotiate with any lenders with secured interests in the Premises." Bar Counsel argues that Chapman, however, testified that he never provided Ms. Bogarosh with any legal services, never discussed alternative courses of action, and never negotiated on her behalf. Moreover, Bar Counsel asserts that while the retainer agreement does state that "the firm [would] be securing the services of one or more consultants[,]" Ms. Bogarosh was not informed that the loan modification services "would be provided exclusively by the consultants or that the consultants would receive all but $200 of the $1,500 fee." According to Bar Counsel, these facts, taken together, inexorably lead to the conclusion that Chapman did not provide any legal services, yet received a fee, in violation of Rule 1.5(a), which requires that fees charged by attorneys be reasonable. The hearing judge disagreed, determining that Chapman did not violate Rule 1.5(a) because, while no legal services were rendered by the firm, non-legal services were provided to the clients that were commensurate with the fees charged.

We shall sustain Bar Counsel's exception. The critical difference between the hearing judge's conclusion and Bar Counsel's assertion is that the judge determined that the fee was reasonable because services were rendered, albeit by Mr. Weiskerger, a non-lawyer, while Bar Counsel emphasizes that no legal services were provided by Mr. Chapman to justify the fee. Rule 1.5 was violated because, in the instant case, Chapman never anticipated, nor did he do, any actual legal

work to justify a fee of $1,500. When asked at the hearing whether the loan modification services were legal services, Chapman responded simply "No," and acknowledged that Ms. Bogarosh did not receive any legal services.

The uncontroverted findings in this case support that a "critical factor" to Ms. Bogarosh when she decided to engage Chapman's firm was that the Chapman firm was a law firm, as opposed to a loan modification business, because she was concerned about having legal advice in addition to loan modification services. The retainer agreement between Ms. Bogarosh and the firm explicitly detailed legal services that would be provided, including negotiation on her behalf, that, by Chapman's own testimony at the hearing, he never provided. In fact, Chapman testified that he knew it was not possible to negotiate with the lenders on behalf of the borrowers early in this practice but, "just never changed the document" to eliminate that language to reflect the actual legal services he was capable of providing.

The hearing judge also found that, "[c]learly, these clients believed they were engaging the services of a law firm to assist with their foreclosure and loan modification problems. The fees were paid to a law firm, and a reasonable client would believe them to be for services rendered by the law firm." With respect to oversight of the clients' matters, the judge specifically noted that, "the arrangement between the parties did mislead clients into believing they were obtaining representation through a law firm, when in reality JW Capital directed the representation."

 The violation of Rule 1.5 occurred in the present case because it is well established that a fee arrangement is unreasonable if the attorney fails to perform any meaningful work on behalf of the client in exchange for the fee. In *Attorney Grievance v. Monfried,* 368 Md. 373, 794 A.2d 92 (2002), we considered whether an attorney who had entered into retainer agreements to provide legal services in two criminal matters, but did not actually provide any legal services, had violated Rule 1.5. We held that Monfried violated

the Rule, stating that "[a]lthough the fee may have been reasonable for the services that [the hearing judge] found were to be provided, respondent did little or no work for [the client]." *Id.* at 394, 794 A.2d at 104. *See also Attorney Grievance v. Stinson,* 428 Md. 147, 166–67, 50 A.3d 1222, 1233–34 (2012); *Attorney Grievance v. McLaughlin,* 372 Md. 467, 504–05, 813 A.2d 1145, 1165–66 (2002).

In the instant case, there is no question that work was performed by the consultant, who was a non-lawyer, hired by Chapman. The retainer agreement, however, sets forth the appropriate scope of the representation and, in this case, anticipated and explicitly referred to legal services that were to have been provided. Chapman never provided such services, nor could have so delivered the negotiating services. The facts as found by the hearing judge illustrate that the only work done for any of the clients was non-legal work performed by Mr. Weiskerger, rather than any legal work undertaken by Chapman. Thus, Rule 1.5(a) was violated.

■ Bar Counsel's second exception relates to the hearing judge's conclusion that Chapman did not violate Rule 1.15(c), which requires that all fees and expenses paid in advance by a client be kept in a trust account and withdrawn as actually earned, unless the client gives informed consent in writing. The hearing judge and Bar Counsel diverge in their opinions because Chapman did inform Ms. Bogarosh in the retainer agreement that the fee would be "earned upon receipt," to which she consented by signing the agreement; Bar Counsel asserts, however, that Rule 1.15(c) requires more than mere consent because it requires "informed consent," defined in Rule 1.0(f) as "the agreement by a person to a proposed course of conduct after the lawyer has communicated adequate information and explanation about the material risks of and reasonably available alternatives to the proposed course of conduct[,]" which the retainer agreement failed to provide.

The retainer agreement in the instant case purported to justify the fee being "earned upon receipt" because Chapman was precluded from, or limited in, representing other clients

by virtue of undertaking representation and because of the need to engage consultants. There is no evidence, however, that the retainer agreement explained the risks associated with paying a fee that would not be held in trust—namely that the fee would be considered earned upon receipt, no matter the level of effort undertaken by the lawyer, and that return of any portion of the fee, thus, could be precluded. Although we have not decided a case involving whether a writing was sufficient to constitute informed consent, the definition in Rule 1.0(f) makes clear that an attorney *must* communicate the risks associated with a fee arrangement that varies from the standard escrow arrangement. As the hearing judge noted, the retainer agreement only contained a small section informing the client that the fee was earned upon receipt. Neither the retainer agreement, nor Chapman personally, explained the material risks associated with entering into an "earned upon receipt" fee agreement, in violation of Rule 1.15(c).

The only matter that remains is to determine the appropriate sanction for Chapman's conduct. As mitigating facts, the hearing judge found that Chapman "wound down" his loan modification services as soon as he was informed about the complaints, that he refunded the fees paid to him by Ms. Bogarosh and Mr. Butler and that Chapman had no prior disciplinary record.

We have often stated that the purpose of sanctioning attorneys is, principally, to protect the public, not to punish the errant attorney. E.g., *Attorney Grievance v. Khandpur,* 421 Md. 1, 17, 25 A.3d 165, 175 (2011). Bar Counsel recommends an indefinite suspension with the right to reapply in 180 days, directing our attention to *Attorney Grievance v. Kimmel and Silverman,* 405 Md. 647, 955 A.2d 269 (2008) and *Attorney Grievance v. Brennan,* 350 Md. 489, 714 A.2d 157 (1998). In *Kimmel and Silverman,* we disciplined two attorneys for violating Rules 5.1 and 1.4, noting that the attorneys had failed to supervise attorneys within their own firm, by imposing an indefinite suspension with the right to reapply in 90 days. In *Brennan,* we imposed a 90 day suspension for an attorney who

had violated Rules 1.3, 1.4, 5.4, 5.5, 8.1, and 8.4 by sharing fees with an attorney who was suspended and misleading his clients.

We agree that Chapman's conduct is similar to that of the attorneys in the cases cited by Bar Counsel, in that similar, although not identical, Rules were violated. Their similarity supports the imposition of an indefinite suspension with the right to reapply in 90 days in the instant case, especially in light of the mitigation found by the hearing judge. In each of those cases cited by Bar Counsel, the errant attorneys failed to adequately supervise those performing work for them, to the detriment of their clients. Moreover, *Brennan* involved not only an attorney who split fees with a non-lawyer but also nearly identical Rules violations, and, as Bar Counsel stated in his recommendation for sanction, "Respondent's conduct was analogous to that of Mr. Brennan." We believe, as a result, that the appropriate sanction in this case is an indefinite suspension with the right to reapply after 90 days.

**IT IS SO ORDERED; RESPONDENT SHALL PAY ALL COSTS AS TAXED BY THE CLERK OF THIS COURT, INCLUDING THE COSTS OF ALL TRANSCRIPTS, PURSUANT TO MARYLAND RULE 16–761, FOR WHICH SUM JUDGMENT IS ENTERED IN FAVOR OF THE ATTORNEY GRIEVANCE COMMISSION AGAINST GERALD FREDERICK CHAPMAN.**

McDONALD, J., concurs.

McDONALD, J., concurring.

I have no quarrel with the judgment rendered by the Court. I do differ, however, with the Court's ruling on one of the exceptions, which does not affect the disposition of the case.

Many homeowners caught up in the recent foreclosure crisis have sought assistance in negotiating a modification of their mortgage to avoid foreclosure for the ultimate benefit of both the homeowner and the lender. Attorneys may provide such assistance. Examples can be found in the Foreclosure Prevention Project endorsed by this Court, which provides in-

struction to attorneys in loan modification, among other things. *See* http://probonomd.org/about–us/104–foreclosure–prevention–pro–bono–project. But attorneys are not the exclusive providers of such assistance.[1]

Many homeowners who could benefit from such assistance cannot afford to pay the typical fees charged by attorneys but also do not qualify for free legal services; not all can be accommodated by the Foreclosure Prevention Project. According to the findings of the hearing judge, Mr. Chapman was apparently trying to develop a practice that would meet this need in a way that he apparently believed would comply with the relevant law. Although he was able to achieve favorable outcomes for many clients, he failed to comply with certain provisions of the Maryland Lawyers' Rules of Professional Conduct.

One of the alleged violations was based on Rule 1.5(a), which concerns the reasonableness of fees and expenses charged by an attorney. In the case of Ms. Bogarosh, the client agreement revealed that Mr. Chapman would be retaining a consultant to assist with the loan modification efforts, and that a portion of the client's payment would be used to pay that expense. And it was undisputed that loan modification efforts were actually undertaken on behalf of Ms. Bogarosh, although they proved unsuccessful, in part due to miscommunication. The hearing judge concluded that Mr. Chapman did not violate Rule 1.5(a) because "[t]he fees charged are not unreasonable, based upon the nature of the work that was anticipated at the time the fee was set. Similarly, they were not unreasonable in light of the efforts undertaken . . ." Although this was one of the hearing judge's conclusions of law, it was very much bound up in the particular facts of the case. In this context, I would defer to the judgment of the hearing judge and overrule the exception.

---

**1.** Less scrupulous providers have engaged in abuses that prompted the Legislature to enact various protections for homeowners. *See* Chapters 5, 6, Laws of Maryland 2008; Chapter 509, Laws of Maryland 2005.