66 A.3d 18

**ATTORNEY GRIEVANCE COMMISSION OF MARYLAND**

v.

**Joel Jay FADER.**

**Misc. Docket AG No. 12, Sept. Term, 2012.**

Court of Appeals of Maryland.

May 6, 2013.

396

James N. Gaither, Assistant Bar Counsel, (Glenn M. Grossman, Bar Counsel, Attorney Grievance Commission, Maryland), for Petitioner.

Joseph Murtha, Esq., Lutherville, MD, for Respondent.

Argued before BELL, C.J., HARRELL, BATTAGLIA, GREENE, ADKINS, BARBERA, and McDONALD, JJ.

BATTAGLIA, J.

Joel Jay Fader, Respondent, was admitted to the Bar of this Court on June 1, 1989. On April 3, 2012, the Attorney Grievance Commission, acting through Bar Counsel ("Bar Counsel"), pursuant to Maryland Rule 16–751(a),[1] filed a "Petition for Disciplinary or Remedial Action" against Fader. The

---

1. Rule 16–751(a) provides, in relevant part:

principal complaint, out of two in Bar Counsel's petition, arose from an administrative case between one of Fader's clients and the Maryland Department of Health and Mental Hygiene ("DHMH"), and was filed by an employee of DHMH, Lauren Jones. The complaint alleged that a request Fader had filed with the Office of Administrative Hearings ("OAH") for a postponement of a hearing contained misrepresentations about his health and that a forged letter ostensibly from Fader's treating physician was submitted in support. The complaint also alleged that when challenged about the truthfulness of the representations in the postponement request during the subsequent hearing at OAH, Fader "did not inform [the administrative law judge] that the doctor's note was forged."

The second complaint involved the revocation of a conditional diversion agreement and the resurrection of the charges against Fader, including his inadequate maintenance of two attorney trust accounts, ("ATA 1") and ("ATA 2"),[2] at Wachovia Bank. Bar Counsel alleged that Fader "improperly deposited and maintained earned fees and personal funds" in ATA 1, after having transferred all client funds to ATA 2. Further, Bar Counsel claimed that Fader "failed to maintain his attorney trust account in compliance with Maryland Rules, Title 16, Chapter 600." In the conditional diversion agreement, Fader had admitted engaging in professional misconduct in violation of Rule 1.15(a) and Maryland Rules 16–606.1, 16–607, and 16–609(b); after the Jones complaint was filed, the Attorney Grievance Commission revoked the agreement.

Bar Counsel charged Fader with violations of the Maryland Lawyers' Rules of Professional Conduct 1.1 (Competence),[3] 1.3

---

(a) **Commencement of disciplinary or remedial action.** (1) Upon approval or direction of Commission. Upon approval or direction of the Commission, Bar Counsel shall file a Petition for Disciplinary or Remedial Action in the Court of Appeals.

2. For consistency, we use the same designation for these accounts as Bar Counsel used in its petition for disciplinary action.

3. Rule 1.1 provides: "A lawyer shall provide competent representation to a client. Competent representation requires the legal knowledge,

(Diligence),[4] 1.15(a) and (b) (Safekeeping Property),[5] 3.2 (Expediting Litigation),[6] 3.3(a)(1) and (4) (Candor Toward the Tribunal),[7] 3.4(c) (Fairness to Opposing Party and Counsel),[8]

---

skill, thoroughness and preparation reasonably necessary for the representation."

4. Rule 1.3 provides: "A lawyer shall act with reasonable diligence and promptness in representing a client."

5. Rule 1.15 provides, in pertinent part:

(a) A lawyer shall hold property of clients or third persons that is in a lawyer's possession in connection with a representation separate from the lawyer's own property. Funds shall be kept in a separate account maintained pursuant to Title 16, Chapter 600 of the Maryland Rules, and records shall be created and maintained in accordance with the Rules in that Chapter. Other property shall be identified specifically as such and appropriately safeguarded, and records of its receipt and distribution shall be created and maintained. Complete records of the account funds and of other property shall be kept by the lawyer and shall be preserved for a period of at least five years after the date the record was created.
(b) A lawyer may deposit the lawyer's own funds in a client trust account only as permitted by Rule 16–607b.

6. Rule 3.2 provides: "A lawyer shall make reasonable efforts to expedite litigation consistent with the interests of the client."

7. Rule 3.3 provides, in pertinent part:

(a) A lawyer shall not knowingly:
(1) make a false statement of fact or law to a tribunal or fail to correct a false statement of material fact or law previously made to the tribunal by the lawyer;

\*　　\*　　\*

(4) offer evidence that the lawyer knows to be false. If a lawyer has offered material evidence and comes to know of its falsity, the lawyer shall take reasonable remedial measures.
Rule 1.0 (*o*) provides:
"Tribunal" denotes a court, an arbitrator in a binding arbitration proceeding or a legislative body, administrative agency or other body acting in an adjudicative capacity. A legislative body, administrative agency or other body acts in an adjudicative capacity when a neutral official, after the presentation of evidence or legal argument by a party or parties, will render a binding legal decision directly affecting a party's interests in a particular matter.

8. Rule 3.4 provides, in pertinent part:

5.3(b) and (c) (Responsibility Regarding Nonlawyer Assistants),[9] and 8.4(a)-(d) (Misconduct),[10] and Maryland Rules 16–606 (Name and designation of account),[11] 16–606.1 (Attorney

A lawyer shall not:

\*　　\*　　\*

(c) knowingly disobey an obligation under the rules of a tribunal except for an open refusal based on an assertion that no valid obligation exists[.]

9. Rule 5.3 provides, in pertinent part:

With respect to a nonlawyer employed or retained by or associated with a lawyer:

\*　　\*　　\*

(b) a lawyer having direct supervisory authority over the nonlawyer shall make reasonable efforts to ensure that the person's conduct is compatible with the professional obligations of the lawyer;

(c) a lawyer shall be responsible for conduct of such a person that would be a violation of the Maryland Lawyers' Rules of Professional Conduct if engaged in by a lawyer if:

(1) the lawyer orders or, with the knowledge of the specific conduct, ratifies the conduct involved;　or

(2) the lawyer is a partner or has comparable managerial authority in the law firm in which the person is employed, or has direct supervisory authority over the person, and knows of the conduct at a time when its consequences can be avoided or mitigated but fails to take reasonable remedial action[.]

10. Rule 8.4 provides, in pertinent part:

It is professional misconduct for a lawyer to:

(a) violate or attempt to violate the Maryland Lawyers' Rules of Professional Conduct, knowingly assist or induce another to do so, or do so through the acts of another;

(b) commit a criminal act that reflects adversely on the lawyer's honesty, trustworthiness or fitness as a lawyer in other respects;

(c) engage in conduct involving dishonesty, fraud, deceit or misrepresentation;

(d) engage in conduct that is prejudicial to the administration of justice[.]

11. Rule 16–606 provides:

An attorney or law firm shall maintain each attorney trust account with a title that includes the name of the attorney or law firm and that clearly designates the account as "Attorney Trust Account", "Attorney Escrow Account", or "Clients' Funds Account" on all checks and deposit slips.　The title shall distinguish the account from any other fiduciary account that the attorney or law firm may maintain and from any personal or business account of the attorney or law firm.

trust account record-keeping),[12] 16–607 (Commingling of

---

**12.** Maryland Rule 16–606.1 provides:

(a) **Creation of records.** The following records shall be created and maintained for the receipt and disbursement of funds of clients or of third persons:

(1) Attorney trust account identification. An identification of all attorney trust accounts maintained, including the name of the financial institution, account number, account name, date the account was opened, date the account was closed, and an agreement with the financial institution establishing each account and its interest-bearing nature.

(2) Deposits and disbursements. A record for each account that chronologically shows all deposits and disbursements, as follows: (A) for each deposit, a record made at or near the time of the deposit that shows (i) the date of the deposit, (ii) the amount, (iii) the identity of the client or third person for whom the funds were deposited, and (iv) the purpose of the deposit;

(B) for each disbursement, including a disbursement made by electronic transfer, a record made at or near the time of disbursement that shows (i) the date of disbursement, (ii) the amount, (iii) the payee, (iv) the identity of the client or third person for whom the disbursement was made (if not the payee), and (v) the purpose of the disbursement;

(C) for each disbursement made by electronic transfer, a written memorandum authorizing the transaction and identifying the attorney responsible for the transaction.

(3) Client matter records. A record for each client matter in which the attorney receives funds in trust, as follows: (A) for each attorney trust account transaction, a record that shows (i) the date of the deposit or disbursement; (ii) the amount of the deposit or disbursement; (iii) the purpose for which the funds are intended, (iv) for a disbursement, the payee and the check number or other payment identification; and (v) the balance of funds remaining in the account in connection with the matter; and

(B) an identification of the person to whom the unused portion of a fee or expense deposit is to be returned whenever it is to be returned to a person other than the client.

(4) Record of funds of the attorney. A record that identifies the funds of the attorney held in each attorney trust account as permitted by Rule 16–607 b.

(b) **Monthly reconciliation.** An attorney shall cause to be created a monthly reconciliation of all attorney trust account records, client matter records, records of funds of the attorney held in an attorney trust account as permitted by Rule 16–607 b, and the adjusted month-end financial institution statement balance. The adjusted month-end financial institution statement balance is computed by adding subsequent deposits to and subtracting subsequent disbursements from the financial institution's month-end statement balance.

(c) **Electronic records.** Whenever the records required by this Rule are created or maintained using electronic means, there must be an

funds),[13] and 16–609(a) (Prohibited transactions).[14]

---

ability to print a paper copy of the records upon a reasonable request to do so.

(d) **Records to be maintained.** Financial institution month-end statements, any canceled checks or copies of canceled checks provided with a financial institution month-end statement, duplicate deposit slips or deposit receipts generated by the financial institution, and records created in accordance with section (a) of this Rule shall be maintained for a period of at least five years after the date the record was created.

13. Maryland Rule 16–607 provides:

a. **General prohibition.** An attorney or law firm may deposit in an attorney trust account only those funds required to be deposited in that account by Rule 16–604 or permitted to be so deposited by section b. of this Rule.

b. **Exceptions.** 1. An attorney or law firm shall either (A) deposit into an attorney trust account funds to pay any fees, service charges, or minimum balance required by the financial institution to open or maintain the account, including those fees that cannot be charged against interest due to the Maryland Legal Services Corporation Fund pursuant to Rule 16–610 b 1(D), or (B) enter into an agreement with the financial institution to have any fees or charges deducted from an operating account maintained by the attorney or law firm. The attorney or law firm may deposit into an attorney trust account any funds expected to be advanced on behalf of a client and expected to be reimbursed to the attorney by the client.

2. An attorney or law firm may deposit into an attorney trust account funds belonging in part to a client and in part presently or potentially to the attorney or law firm. The portion belonging to the attorney or law firm shall be withdrawn promptly when the attorney or law firm becomes entitled to the funds, but any portion disputed by the client shall remain in the account until the dispute is resolved.

3. Funds of a client or beneficial owner may be pooled and commingled in an attorney trust account with the funds held for other clients or beneficial owners.

14. Maryland Rule 16–609(a) provides:

a. **Generally.** An attorney or law firm may not borrow or pledge any funds required by the Rules in this Chapter to be deposited in an attorney trust account, obtain any remuneration from the financial institution for depositing any funds in the account, or use any funds for any unauthorized purpose.

In the conditional diversion agreement, which forms the bases for the violations of the Rules, Fader agreed not to a violation of 16–609(a), but to a violation of 16–609(b), which provides:

b. **No cash disbursements.** An instrument drawn on an attorney trust account may not be drawn payable to cash or to bearer, and no cash withdrawal may be made from an automated teller machine or

Pursuant to Rule 16–757,[15] in an order dated April 5, 2012, we referred the petition to Judge Martin P. Welch of the Circuit Court for Baltimore City for a hearing.

At the hearing, Bar Counsel presented testimony from Linda Bailey, who was a docket clerk at OAH at the time the postponement request was faxed; Ms. Jones; Fader; and Fader's fiancée, Elizabeth Collier, who also testified for Fader. Fader also called Dr. Perry Foreman and a variety of character witnesses, in addition to testifying on his own behalf. Various documents were introduced and admitted into evidence, including the transcript of a hearing at OAH that

---

by any other method. All disbursements from an attorney trust account shall be made by check or electronic transfer.

**15.** Rule 16–757 provides:

(a) **Generally.** The hearing of a disciplinary or remedial action is governed by the rules of evidence and procedure applicable to a court trial in a civil action tried in a circuit court. Unless extended by the Court of Appeals, the hearing shall be completed within 120 days after service on the respondent of the order designating a judge. Before the conclusion of the hearing, the judge may permit any complainant to testify, subject to cross-examination, regarding the effect of the alleged misconduct. A respondent attorney may offer, or the judge may inquire regarding, evidence otherwise admissible of any remedial action undertaken relevant to the allegations. Bar Counsel may respond to any evidence of remedial action.

(b) **Burdens of proof.** The petitioner has the burden of proving the averments of the petition by clear and convincing evidence. A respondent who asserts an affirmative defense or a matter of mitigation or extenuation has the burden of proving the defense or matter by a preponderance of the evidence.

(c) **Findings and conclusions.** The judge shall prepare and file or dictate into the record a statement of the judge's findings of fact, including findings as to any evidence regarding remedial action, and conclusions of law. If dictated into the record, the statement shall be promptly transcribed. Unless the time is extended by the Court of Appeals, the written or transcribed statement shall be filed with the clerk responsible for the record no later than 45 days after the conclusion of the hearing. The clerk shall mail a copy of the statement to each party.

(d) **Transcript.** The petitioner shall cause a transcript of the hearing to be prepared and included in the record.

(e) **Transmittal of record.** Unless a different time is ordered by the Court of Appeals, the clerk shall transmit the record to the Court of Appeals within 15 days after the statement of findings and conclusions is filed.

occurred on December 15, 2010; the transcript of Fader's deposition taken by Bar Counsel on June 14, 2011; a redacted copy of Jones's original complaint; and a copy of the hand-written cover letter submitted with a fabricated letter containing the signature of Dr. Foreman, one of Fader's treating physicians.

After the hearing, Judge Welch issued written Findings of Fact and Conclusions of Law, in which he determined, with respect to Ms. Jones's complaint, that Fader violated Maryland Lawyers' Rules of Professional Conduct 3.3(a)(1) and (4), 5.3(b), and 8.4(a) and (c), but did not violate Rules 1.1, 1.3, 3.2, 3.4(c), 5.3(c), and 8.4(b) and (d). With respect to Bar Counsel's complaint regarding the lawyer trust accounts, Judge Welch concluded that Fader violated Maryland Lawyers' Rules of Professional Conduct 1.15(a) and (b), and 8.4(a) and (d), and Maryland Rules 16–606.1, 16–607, and 16–609(b).[16]

Judge Welch's Findings of Facts and Conclusions of Law state:

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

### I. INTRODUCTION

Pursuant to an order of the Court of Appeals dated April 5, 2012, this matter was assigned and transmitted to the Circuit Court for Baltimore City to be heard and determined by the undersigned judge of the Eighth Judicial Circuit in accordance with Rule 16–757.

The Petition, as set forth by the Attorney Grievance Commission (hereinafter "Petitioner"), alleges two distinct

---

**16.** In the Conclusions of Law, Judge Welch determined Fader violated Rule 16–609(b), as opposed to Rule 16–609(a) for which Fader was charged. Because the Petition did not refer to subsection (b), the correct reference, we will not consider its violation in our determination of culpability and sanction.

Also, the hearing judge did not address Bar Counsel's charge that Fader violated Maryland Rule 16–606, but no exception was filed with regard to the omission; as a result, we will not include any reference to Rule 16–606 in our discussion.

instances of misconduct by Respondent, Joel Jay Fader, Esquire (hereinafter "Respondent"). The first alleged incident of misconduct (BC Docket No. 2010–253–04–17) stems from the mismanagement of an attorney trust account, which had resulted in a Conditional Diversion Agreement (hereinafter "CDA"). Relating to this incident, the Petition specifically alleges violations of Maryland Lawyers' Rules of Professional Conduct (hereinafter "MRPC") 1.15(a), 1.15(b), 8.4(a), and 8.4(d) as well as Maryland Rules 16–606.1, 16–607, and 16–609(a). Upon the determination by Petitioner that Respondent had engaged in new misconduct due to the second alleged incident of misconduct, Petitioner revoked the CDA.

The second alleged incident of misconduct (BC Docket No. 2011–343–03–17) stems from Respondent's representation of Patricia Liquefatto in a matter before the Office of Administrative Hearings (hereinafter "OAH"). The alleged misconduct specifically relates to the circumstances surrounding a request for a postponement of the matter on October 27, 2010, which sought a postponement of a matter set for a hearing on October 28, 2010, and the subsequent documentation provided in support of that request on November 4, 2010. The Petition alleges that Respondent violated Maryland Lawyers' Rules of Professional Conduct 1.1, 1.3, 3.2, 3.3, 3.4, 5.3, and 8.4 through his behavior relating to this matter.

Pursuant to Rule 16–757(a), an evidentiary hearing for this Attorney Grievance matter was held on August 27, 2012, and August 28, 2012, before this Court. James N. Gaither, Esquire represented the Petitioner, the Attorney Grievance Commission of Maryland, and Joseph Murtha, Esquire, represented Respondent, Joel Jay Fader, Esquire. During the course of the hearing, Linda Bailey, Lauren Jones, Esquire, Respondent, and Elizabeth Collier testified in Petitioner's case in chief. Elizabeth Collier, Perry Foreman, M.D., Ph.D., Dominic Garcia, Esquire, Gregory Jones, Esquire, Michael Eisenstein, Esquire, James Farley, Esquire, Cheryl Chromartie, Esquire, Cynthia Unglesbee, Es-

quire, and Respondent, testified during Respondent's case in chief.

## II. STANDARD OF REVIEW

Maryland Rule 16–757 provides that "[t]he hearing of a disciplinary action is governed by the rules of evidence and procedure applicable to a court trial in a civil action tried in circuit court." Md. Rule 16–757(a). Further, the Rule provides that "[t]he petitioner has the burden of proving averments of the petition by clear and convincing evidence. A respondent who asserts an affirmative defense or a matter of mitigation or extenuation has the burden of proving the defense or matter by a preponderance of the evidence." Md. Rule 16–757(b). The Court of Appeals has defined clear and convincing evidence, stating:

> The requirement of "clear and convincing" or "satisfactory" evidence does not call for "unanswerable" or "conclusive" evidence. The quality of proof, to be clear and convincing, has also been said to be somewhere between the rule in ordinary civil cases and the requirement of criminal procedure—that is, it must be more than a mere preponderance but not beyond a reasonable doubt. It has also been said that the term "clear and convincing" evidence means that the witnesses to a fact must be found to be credible, and that the facts to which they have testified are distinctly remembered and the details thereof narrated exactly and in due order, so as to enable the trier of the facts to come to a clear conviction, without hesitancy, of the truth of the precise facts in issue. Whether evidence is clear and convincing requires weighing, comparing, testing, and judging its worth when considered in connection with all the facts and circumstances in evidence.

*Attorney Grievance Comm'n v. Smith,* 405 Md. 107, 123–24 [950 A.2d 101] (2008) (quoting *Attorney Grievance Comm'n v. Mooney,* 359 Md. 56, 79 [753 A.2d 17] (2000)).

### III. FINDINGS OF FACT [17]

Pursuant to Maryland Rule 16–757(b), the Court finds the following facts:

#### A. General Factual Background

1. Respondent is a fifty-one (51) year old attorney who currently practices law in Baltimore, Maryland.

2. Respondent began his legal career in Florida where he worked as a commercial litigator from 1986 through 1989, and his practice primarily focused on commercial litigation, covenant not-to-compete work and employment contracts.

3. Respondent is still a member of the Florida Bar.

4. Respondent has been admitted to practice law in the State of Maryland since 1989.

5. Upon arriving in Maryland, Respondent initially worked for Howard Cardin, Esquire, and James Gitomer, Esquire. During the approximately two and a half years during which Respondent worked for these attorneys, his practice involved family law, workers' compensation law, personal injury law, criminal law, and some trusts and estates law.

6. Respondent then began working for James Farley, Esquire. While working for Mr. Farley, Respondent's practice involved domestic work, workers' compensation law, personal injury law, and criminal law.

7. Respondent opened his own law firm in 1996 and primarily practices in the areas of workers' compensation law, family, personal injury law, and some minor criminal law.

8. As of the evidentiary hearing, Respondent does not employ any staff, however, he has employed Ms. Katherine Saunders on an irregular, part-time basis.

---

17. The hearing judge's references to the record have been omitted.

9. Beginning in December of 2000, Respondent has also employed Elizabeth Collier, as a paralegal on a part-time basis.

10. After graduating from high school, Ms. Collier attended school for nursing and then switched her focus to paralegal studies.

11. Ms. Collier does not have a paralegal certificate nor did she earn a college degree.

12. Ms. Collier became involved with the legal profession by working as a receptionist or secretary for various law firms.

13. While employed by Respondent, Ms. Collier's duties included managing clients, talking on the telephone, drafting pleadings, taking dictation, meeting with clients for small things, making copies, and various other tasks traditionally performed by paralegals.

14. Ms. Collier also drafted motions, including motions for postponements, while working for Respondent.

15. Respondent's relationship with Ms. Collier became romantic in nature in the spring of 2008 while Ms. Collier was married.

16. Currently, Respondent and Ms. Collier have two children together.

17. Respondent and Ms. Collier's second child was born on October 28, 2010.

18. Respondent was diagnosed with epilepsy on January 20, 2010, after having suffered his first grand mal seizure on December 7, 2009, which resulted in hospitalization.

19. Respondent is treated by Perry Foreman, M.D., Ph.D. (hereinafter "Dr. Foreman"), who specializes in neurology and focuses primarily on epilepsy and clinical neurophysiology.

20. Since the initial diagnosis of epilepsy in January of 2010, Respondent has experienced a number of seizures, some of which have required hospitalization.

21. On May 7, 2010, Respondent experienced another grand mal seizure, which required hospitalization. Almost a year later, on May 9, 2011, Respondent experienced a third grand mal seizure while driving a car, which resulted in an automobile accident and hospitalization. Respondent had a fourth grand mal seizure on July 31, 2011.

22. Respondent would occasionally experience seizures that were less severe in nature, called breakthrough or absence seizures.

23. Respondent experienced symptoms of depression as a consequence of the onset of epilepsy. Such depression is commonly associated with epilepsy, and Respondent sought treatment for his depression from a psychiatrist, Alfred Forrester, M.D., for his depression.

24. As of the date of Hearing, Respondent is in compliance with the treatment plans recommended by Dr. Forrester for his mental health and Dr. Foreman for his physical health.

25. After each grand mal seizure, Respondent ceased driving at doctor's direction for a period of time. After his May 2011 grand mal seizure, Respondent stopped driving for almost a year; he was cleared to drive again on April 29, 2012.

26. Respondent often relied on Ms. Collier for transportation.

**B. Findings of Fact Relevant to the Attorney Trust Account Complaint**

27. In mid to late 2008, Respondent's motor vehicle was stolen. At the time the motor vehicle was stolen, a checkbook and paperwork from Respondent's attorney trust account, which ended in 6894 (hereinafter "ATA 1") were located inside of the vehicle.

28. Respondent, fearing that someone might forge a check against ATA 1, opened a second attorney trust account, which ended in 9419 (hereinafter "ATA 2").

29. Respondent transferred all client funds from ATA 1 to ATA 2 and proceeded to use ATA 2 as his IOLTA account.

30. Concerned about potential scriveners' errors, Respondent left his own fees in ATA 1.

31. In the fall and summer of 2009, Respondent began to use ATA 1 as an account upon which he drew his rent.

32. On October 23, 2009, Bar Counsel received notification from Respondent's bank, Wachovia Bank, of an overdraft on an ATA 1.

33. The notice indicated that a check in the amount of $1,910.00 was presented against a balance of $927.06.

34. While Respondent's misconduct was not the result of any willful or dishonest conduct, there were several irregularities regarding his attorney trust accounts.

35. Respondent improperly titled and designated ATA 2.

36. Respondent failed to reconcile ATA 2 for the month of February 2010.

37. Respondent made several withdrawals labeled "counter withdrawals" that were not associated with any client.

38. As a result of this misconduct and pursuant to Maryland Rule 16–736, the Attorney Grievance Commission entered into a CDA with Respondent that would run from December 15, 2010 through December 15, 2012. Pursuant to the CDA, James J. Farley, Esquire, was to serve as Respondent's law practice monitor and Dr. Alfred Forrester, M.D., was to be Respondent's medical provider monitor.

39. By signing the CDA, Respondent acknowledged that he had violated 1.15(a) of the Maryland Lawyers' Rules of Professional Conduct and Maryland Rules 16–606.1, 16–607, 16–609(b).

40. Respondent, following his entrance into the CDA, worked to get his files in proper order, and his files and bank accounts were in good order.

C. **Findings of Fact Relevant to the Complaint Involving the Postponement Request Sent to the OAH for the Patricia Liquefatto Wrongful Termination Hearing.**

41. Respondent was engaged to represent Patricia Liquefatto in a wrongful termination case before the OAH.

42. Respondent was representing Ms. Liquefatto *pro bono* because he had previously represented her and her family members in a variety of other matters.

43. An OAH hearing in Ms. Liquefatto's case was scheduled for October 28, 2010, before Administrative Law Judge Susan Sinrod.

44. Respondent did not go to his office at all on October 27, 2010. Instead, Respondent remained at the residence where he prepared for the OAH hearing with the majority of the file.

45. The residence, which Respondent shared with Ms. Collier, was located on Taney Road in Baltimore City.

46. On October 27, 2010, Respondent was on the verge of moving to a new residence pursuant to a lease that was to begin on November 1, 2010.

47. There was no electricity in the Taney Road residence at the time.

48. Respondent suffered several mild seizures during the day of October 27, 2010.

49. On October 27, 2010, Ms. Collier was in the process of extricating herself from her romantic relationship with Respondent. She was attempting to move her belongings back to the home she shared with her then husband.

50. On October 27, 2010, Ms. Collier was roughly 36 to 37 weeks pregnant with her second child with Respondent.

51. On October 27, 2010, Ms. Collier was in the late stages of her pregnancy. She was in a lot of pain and feeling "miserable and just tired...."

52. Ms. Collier arrived in the office at approximately 11:00 a.m. or 12:00 p.m. after having been to the residence on Taney Road, where she packed some of her belongings and saw Respondent.

53. While at the residence, Respondent expressed to Ms. Collier that he was not feeling well and that the OAH hearing scheduled for the following day needed to be postponed.

54. Ms. Collier created and faxed a postponement request to the OAH, which was accompanied by a copy of the label on Respondent's prescribed seizure medication and an altered out-of-work slip from Dr. Foreman, Respondent's treating physician at Sinai Hospital. Ms. Collier had altered the dates on a previously issued out-of-work slip prior to faxing a copy to the OAH.

55. Ms. Collier faxed this postponement request with a copy of Respondent's signature as well as the supporting materials she had created to the OAH at approximately 5:00 p.m. on October 27, 2010.

56. Ms. Collier transported Respondent to a regularly scheduled appointment with his psychiatrist, Dr. Forrester, in Cockeysville. The appointment lasted from 6:00 p.m. to 7:00 p.m., and Ms. Collier waited to transport Respondent back to the residence they shared at Taney Road after the appointment.

57. At some point in the evening of October 27, 2010, Respondent called Ms. Liquefatto and left a voicemail message stating that he was not feeling well. He advised Ms. Liquefatto via this voicemail that he would not be attending the OAH hearing on October 28, 2012, and he opined that the OAH hearing would likely be postponed if he failed to attend.

58. Also on the evening of October 27, 2010, Respondent made an effort to contact opposing counsel in the Liquefatto matter, leaving a message that Respondent was experiencing seizures and would not likely be able

to appear for the scheduled OAH hearing on October 28, 2010.

59. At approximately 8:30 p.m. on October 27, 2010, Respondent made a call to the OAH and left a voicemail message stating that he was on his way to Sinai Hospital because of his epileptic condition.

60. After they returned to the Taney Road residence from Respondent's appointment with Dr. Forrester, Ms. Collier drove Respondent to Sinai Hospital. Respondent and Ms. Collier arrived at Sinai Hospital, but Respondent chose not to stay due to the number of people awaiting treatment and Ms. Collier's discomfort.

61. Collier then returned Respondent to their residence on Taney Road and proceeded to return to her marital home in Dundalk.

62. Upon returning to her marital home in Dundalk, Ms. Collier went into labor with her second child with Respondent.

63. Ms. Collier's then husband transported her to Greater Baltimore Medical Center (hereinafter "GBMC") where she gave birth in the morning of October 28, 2012, to her second child with Respondent.

64. Ms. Collier's then husband also transported Respondent to GBMC in time for his child's birth by [*sic*].

65. On the morning on October 28, 2012 at approximately 8:30 a.m., Respondent placed a telephone call to the OAH, leaving a message that stated that he was at GBMC. He did not indicate why he was there.

66. Neither Respondent nor Ms. Liquefatto appeared for the scheduled OAH hearing on October 28, 2010.

67. On October 28, 2010, Judge Sinrod postponed the scheduled OAH hearing contingent upon Respondent's production of a letter from his doctor on his doctor's letterhead detailing Respondent's condition on October 27, 2010, and October 28, 2010.

68. Respondent handwrote a request to his staff that they gather and send the required documentation in response to Judge Sinrod's request.

69. Respondent's handwritten request was primarily directed to Ms. Collier rather than the other staff member, Katherine Saunders, who worked on an irregular, part-time basis.

70. Ms. Collier created a letter purported to be from Dr. Foreman, stating that on the evening of October 26, 2010, Respondent had been transported to Sinai Hospital Emergency Room and had been released on October 27, 2010, with a disability slip, which excused Respondent from work until November 3, 2010.

71. Respondent drafted a handwritten fax coversheet, dated November 4, 2010, to the OAH noting that the attendant faxed materials were those requested by Judge Sinrod.

72. A fax with this cover letter drafted by Respondent as well as a letter purportedly from Dr. Foreman was sent to the OAH.

73. Respondent did not review the forged letter from Dr. Foreman prior to its transmission to the OAH.

74. The forged letter included a number of details about Respondent's medical condition and stated that he had been unwell the day of October 26, 2010, and had been admitted to Sinai Hospital that evening and then released the following day, October 27, 2012. The letter went on to state that the cause of the minor seizure that Respondent experienced was a missed dose of the prescribed medication, Keppra.

75. Ms. Collier did not place a copy of either the postponement request or the forged letter into the client file.

76. An OAH hearing was held regarding the Liquefatto matter on December 15, 2010, during which opposing counsel challenged the validity of the attendant letter purportedly from Dr. Foreman. Opposing counsel

drew Judge Sinrod's attention to the misspelling of the building address of the doctor on the letterhead used as well as the differences between the letterhead used on the faxed letter and the letterhead sent to opposing counsel by the physician. Additionally, opposing counsel represented to Judge Sinrod that when his staff contacted the doctor's office, the office informed his staff that no one there had produced such a letter.

77. Prior to this December 15, 2010 OAH hearing, Ms. Collier did not inform Respondent of the specifics of the postponement request she had sent on October 27, 2010, or of the specifics relating to the supportive documentation she had sent to the OAH on November 4, 2010.

78. During the December 15, 2010 OAH hearing, opposing counsel also referred to the discussion of a grand mal seizure in the original postponement request.

79. At the December 15, 2010 OAH hearing, Respondent stated that he had relied on his paralegal to obtain the requested documentation and that it could be possible that she had "created some documents."

80. Also at the December 15, 2010 hearing, Respondent stated that on October 27, 2010, he had filed a motion for postponement with the court and had attached a copy of his Keppra prescription.

81. At the December 15, 2010 OAH hearing, Respondent also represented to the OAH that he sought and received treatment at Sinai Hospital where he was informed that he was experiencing seizures, which had been diagnosed as idiopathic epilepsy without any kind of particular stimulating factor, and that he was having a stress reaction to the prescribed Keppra.

82. At the December 15, 2010 OAH hearing, Respondent informed Judge Sinrod that his daughter had been born on the morning of October 28, 2010.

83. Judge Sinrod chose to proceed with the OAH hearing in the Liquefatto matter.

84. On May 9, 2011, Respondent was hospitalized following an automobile accident that had been caused by a grand mal seizure. While in the hospital recuperating on May 10, 2011, Ms. Collier informed Respondent that an investigator had contacted her from the Attorney Grievance Commission. She informed Respondent that she had submitted the postponement request and that she had forged a letter from Dr. Foreman in support of that postponement request.

85. Respondent was transferred to the psychiatric unit as a result of Ms. Collier's disclosures.

86. Respondent was released from Sinai Hospital's psychiatric unit on May 15, 2011.

87. On June 14, 2011, under oath and without counsel, Respondent was interviewed by Bar Counsel about the postponement of the OAH hearing in the Liquefatto matter.

88. During the course of his interview with Bar Counsel, Respondent stated that he had produced the request for postponement. Though Respondent did not recall drafting the request, he relied on the presence of his signatures on the fax coversheet, the request itself, and certificate of service.

## IV. CONCLUSIONS OF LAW

### a. Legal Conclusions Relating to Respondent's Attorney Trust Accounts and Respondent's Conditional Diversion Agreement

The Court finds by clear and convincing evidence, namely Respondent's admission in signing the CDA, that Respondent violated Maryland Lawyers' Rule of Professional Conduct 1.15(a) and Maryland Rules 16–606.1, and 16–607, and 16–609(b).

Additionally, the Court finds that Respondent's conduct in depositing and maintaining personal funds in ATA 1 and ATA 2 also violates Maryland Lawyers' Rules of Professional Conduct 1.15(b) and 8.4(a) and (d). In admitting to

violating Maryland Rule 16–607 by signing the CDA, Respondent also acknowledges that he violated MRPC 1.15(b), which provides that "[a] lawyer may deposit the lawyer's own funds in a client trust account only as permitted by Rule 16–607(b)." MRPC 1.15(b). Likewise, "Rule 8.4(a) requires a finding that the Respondent has violated other rules." *Attorney Grievance Comm'n v. Zakroff,* 387 Md. 603, 628 [876 A.2d 664] (2005). Therefore, because Respondent had acknowledged his violation of MRPC 1.15(a), he has also, essentially, conceded that he has also violated MRPC 8.4(a) as well.

As to MRPC 8.4(d), the Court of Appeals has explained that an act prejudicial to the administration of justice is one that "tends to bring the legal profession into disrepute." *Attorney Grievance Comm'n v. Goodman,* 426 Md. 115, 128 (2012) (citing and quoting *Attorney Grievance Comm'n v. Rose,* 391 Md. 101, 111 [892 A.2d 469] (2006)). Commingling of personal and client funds, including the failure to maintain a separate trust account, has been determined to be prejudicial to the administration of justice, and therefore violates Rule 8.4(d). *Id.* (citing *Attorney Grievance Comm'n v. Carithers,* 421 Md. 28, 56 (2011)) (concluding that misappropriation of client funds and failure to maintain client trust account violated MRPC 8.4(d)).

Therefore, the Court finds that Petitioner has demonstrated by clear and convincing evidence that Respondent's misconduct with respect to his management of his attorney trust accounts violated Rules 1.15(a) and (b) and 8.4(a) and (d) of the Maryland Lawyers' Rules of Professional Conduct and Maryland Rules 16–606.1, 16–607, and 16–609(b).

**b. Legal Conclusions Relating to the Postponement of the Liquefatto Matter before the OAH.**

**i. Maryland Rule of Professional Conduct 1.1: Competence**

"A lawyer shall provide competent representation to a client. Competent representation requires the legal knowl-

edge, skill, thoroughness and preparation reasonably necessary for the representation." MRPC 1.1. The Court of Appeals has held that "an attorney's failure to appear in court for a client's trial, absent an acceptable explanation, [is] incompetent representation and a violation of MRPC 1.1." *Attorney Grievance Comm'n v. Harris*, 366 Md. 376, 403 [784 A.2d 516] (2001) ([citing] *Attorney Grievance Comm'n v. Mooney*, 359 Md. 56, 74 [753 A.2d 17] (2000)). The Court finds by clear and convincing evidence that Respondent failed to appear for the scheduled hearing in the Liquefatto matter on October 28, 2010. The Court notes the dubious explanations offered to the OAH through the October 27, 2010 fax containing the postponement request and the altered out-of-work-slip; the telephone call placed on the evening of October 27, 2010, by Respondent stating he was on his way to Sinai Hospital; the telephone call placed on the morning of October 28, 2010, by Respondent stating that he was at GBMC; and those explanations offered orally at the December 15, 2010 OAH hearing in the Liquefatto matter. The Court finds, however, by a preponderance of the evidence that Respondent did have an acceptable explanation for his failure to appear for his client's scheduled hearing on October 28, 2010, before the OAH. Specifically, the Court finds that Respondent had experienced several mild seizures due to his epileptic condition through the course of the day on October 27, 2010, and such seizures the day before a hearing constitute a valid reason to seek a postponement of that hearing.

Therefore the Court is not convinced by clear and convincing evidence that Respondent violated MRPC 1.1.

### ii. Maryland Rule of Professional Conduct 1.3: Diligence

"A lawyer shall act with reasonable diligence and promptness in representing a client." MRPC 1.3. The Court of Appeals has determined that an attorney's failure to appear can constitute a violation of MRPC 1.3. *Attorney Grievance Comm'n v. Byrd*, 408 Md. 449, 478 [970 A.2d 870] (2009).

The Court finds that despite Respondent's failure to appear for the scheduled OAH hearing in the Liquefatto matter on October 28, 2010, Petitioner has failed to show by clear and convincing evidence that Respondent failed to act with reasonable diligence and promptness in the representation of his client, Patricia Liquefatto. Respondent has shown by a preponderance of the evidence that his medical condition on October 27, 2010, necessitated that he seek a postponement of the matter. Furthermore, had Respondent failed to seek a postponement and been required to represent his client before the OAH in his medical condition at the time, he would likely have been unable to adequately represent his client.

Therefore, Petitioner has not shown by clear and convincing evidence that Respondent violated MRPC 1.3.

### iii. Maryland Rule of Professional Conduct 3.2: Expediting Litigation

"A lawyer shall make reasonable efforts to expedite litigation consistent with the interests of the client." MRPC 3.2. Comment 1 of MRPC 3.2 further clarifies this requirement by providing that:

> Although there will be occasions when a lawyer may properly seek a postponement for personal reasons, it is not proper for a lawyer to routinely fail to expedite litigation solely for the convenience of the advocates. Nor will a failure to expedite be reasonable if done for the purpose of frustrating an opposing party's attempt to obtain rightful redress or repose. It is not a justification that similar conduct is often tolerated by the bench and bar. The question is whether a competent lawyer acting in good faith would regard the course of action as having some substantial purpose other than delay. Financial or other benefit from otherwise improper delay in litigation is not a legitimate interest of the client.

MRPC 3.2, cmt. 1. Considering the Court's finding by a preponderance of the evidence that Respondent experienced several seizures caused by his epilepsy on October 27, 2010,

the Court concludes that Respondent was acting in good faith when he sought a postponement of the October 28, 2010 hearing. Although the initial faxed postponement request contained a forged attachment and clearly false statements regarding the type of seizure Respondent had experienced that day, the desire to postpone the matter was properly motivated by his poor health that day.

Therefore, Petitioner has not shown by clear and convincing evidence that Respondent violated MRPC 3.2.

### iv. Maryland Rule of Professional Conduct 3.3: Candor Towards the Tribunal

"A lawyer shall not knowingly . . . make a false statement of fact or law to a tribunal or fail to correct a false statement of material fact or law previously made to the tribunal by the lawyer. . . ." MRPC 3.3. The Court finds by clear and convincing evidence that the Respondent left a voicemail message at the OAH at approximately 8:30 p.m. on October 27, 2010, requesting a postponement because of seizure activity and his then-pending treatment at Sinai Hospital. The Court also finds by clear and convincing evidence that Respondent left an additional voicemail message at OAH on the morning of October 28, 2010, in which he stated only that he was at GBMC and could not appear at the hearing that morning. Because Respondent failed to include in his message that he was at GBMC awaiting the impending birth of this child, Respondent failed to correct his prior statement to the tribunal that he was seeking treatment for his seizures.

Additionally, the Court finds by clear and convincing evidence that on December 15, 2010, when Respondent appeared before Judge Sinrod, he further failed to correct his previously made false statement made to the OAH in the voicemail left the evening of October 27, 2010, regarding his treatment at Sinai Hospital. Further, in light of both Ms. Collier and Respondent's testimony that they left Sinai Hospital's emergency room due to the large crowd and Ms. Collier's discomfort prior to Respondent receiving any treat-

ment or diagnosis from a physician, Respondent overtly misled Judge Sinrod on December 15, 2010. Respondent falsely represented to Judge Sinrod that he had not only sought treatment but had also received treatment at Sinai Hospital on October 27, 2010, in the form of diagnosis as to the nature and cause of the mild seizures he had suffered earlier that day.

Therefore, Petitioner has shown by clear and convincing evidence that Respondent violated MRPC 3.3.

### v. Maryland Rule of Professional Conduct 3.4: Fairness to Opposing Counsel

In relevant part, the Maryland Rule of Professional Conduct 3.4 provides that "[a] lawyer shall not ... knowingly disobey an obligation under the rules of a tribunal except for an open refusal based on an assertion that no valid obligation exists...." MRPC 3.4(c). A repeated failure to appear in court is a violation of Rule 3.4(c) of the MRPC. *See Attorney Grievance Comm'n v. Mininsohn*, 380 Md. 536, 569–570 [846 A.2d 353] (2004). However, an attorney's failure based on presumed or anticipated permission to postpone hearing is not a knowing violation of 3.4(c). *Attorney Grievance Comm'n v. Dietz*, 331 Md. 637 [629 A.2d 678] (1993).

The Court finds by a preponderance of the evidence that Respondent failed to appear due to a presumed postponement and that Respondent also attempted to contact opposing counsel to advise him that Respondent was not feeling well and would likely not be able to attend the hearing on October 28, 2010.

Therefore, Petitioner has failed to show by clear and convincing evidence that Respondent violated MRPC 3.4(c).

### vi. Maryland Rule of Professional Conduct 5.3: Responsibilities Regarding Nonlawyer Assistants

In relevant part, Maryland Rule of Professional Conduct 5.3 provides that with respect to a nonlawyer employed or managed by a lawyer:

(b) a lawyer having direct supervisory authority over the nonlawyer shall make reasonable efforts to ensure that the person's conduct is compatible with the professional obligations of the lawyer; [and]

(c) a lawyer shall be responsible for conduct of such a person that would be a violation of the Maryland Lawyers' Rules of Professional Conduct if engaged in by a lawyer if:

(1) the lawyer orders or, with the knowledge of the specific conduct, ratifies the conduct involved

. . . .

MRPC 5.3.

The Court finds by clear and convincing evidence that Respondent violated MRPC 5.3(b) based upon his failure to properly supervise Ms. Collier, his nonlawyer employee. The Court finds that Respondent failed to properly supervise Ms. Collier because he failed to review documents she prepared and he was inappropriately dependent upon her to manage his professional and personal affairs. The Court finds this failure to review the documents Ms. Collier produced, as well as Respondent's dependence upon her, to be especially disconcerting considering Ms. Collier's lack of formal training as a paralegal; the level of stress she was experiencing due to her pregnancy, of which Respondent was wholly aware; her tumultuous relationship with Respondent; and her responsibilities to their newborn child. The Court further notes that even after becoming aware that there were questionable submissions made on his behalf by Ms. Collier, Respondent failed to follow up with Ms. Collier as to what documents had been submitted and what materials were absent from his case file.

As to MRPC 5.3(c)(1), the Court finds that Petitioner has failed to prove by clear and convincing evidence that Respondent violated MRPC 5.3(c)(1). Specifically, the Court is not convinced that Respondent ratified with specific knowledge Ms. Collier's conduct, namely her submission to the OAH of a forged out-of-work slip sent with the postpone-

ment request on October 27, 2010, and the subsequent submission to the OAH of the forged letter from Dr. Foreman.

Therefore, the Court finds that Petitioner has shown by clear and convincing evidence that Respondent violated MRPC 5.3(b).

### vii. Maryland Rule of Professional Conduct 8.4

It is professional misconduct for a lawyer to:

(a) violate or attempt to violate the Maryland Lawyers' Rules of Professional Conduct, knowingly assist or induce another to do so, or do so through the acts of another;

(b) commit a criminal act that reflects adversely on the lawyer's honesty, trustworthiness or fitness as a lawyer in other respects;

(c) engage in conduct involving dishonesty, fraud, deceit or misrepresentation; [or]

(d) engage in conduct that is prejudicial to the administration of justice....

MRPC 8.4. The Court of Appeals has held that when a "respondent has violated several Rules of Professional Conduct, he necessarily violated MRPC 8.4(a) as well, which finds professional misconduct where a lawyer 'violate[s] or attempt[s] to violate the Rules of Professional Conduct.' " *Attorney Grievance v. Gallagher,* 371 Md. 673, 710–11 [810 A.2d 996] (2002) (quoting MRPC 8.4(a)). The Court finds that because the Court has found that Respondent violated Maryland Rules of Professional Conduct 1.15(a), 3.3, and 5.3(b), Respondent has also violated Maryland Rule of Professional Conduct 8.4(a).

The Court notes that no evidence was introduced to show that Respondent committed any criminal act; therefore the Court finds that Respondent did not violate MRPC 8.4(b).

As to MRPC 8.4(c), the Court finds that in calling the OAH on the morning of October 28, 2010, and stating only that he was at GBMC after having called the previous evening stating that he was at Sinai Hospital being treated

for his seizure disorder, Respondent knowingly misled the OAH by failing to state that he was at GBMC to witness the birth of his child. Respondent's failure to correct the basis of his postponement request from his medical seizure condition to the impending birth of his child constitutes a misrepresentation. Therefore, the Court finds by clear and convincing evidence that Respondent engaged in a misrepresentation in violation of MRPC 8.4(c).

Upon review of Respondent's testimony under oath before Bar Counsel as well as his testimony in trial before this Court, the Court finds by clear and convincing evidence that Respondent further violated MRPC 8.4(c). At trial, both Respondent and Ms. Collier testified that on May 10, 2011, she informed him of her submission of the postponement request along with the fabricated out-of-work slip and her subsequent submission of the forged letter from Dr. Foreman. In fact, this revelation brought about a psychiatric hospitalization. Despite this seemingly epic revelation of Collier's forged submissions to OAH and its resulting effect upon Respondent's mental health, Respondent testified under oath before Bar Counsel on June 14, 2011, that he had actually submitted the postponement request. The Court finds by clear and convincing evidence that Respondent was dishonest in violation of MRPC 8.4(c).

With respect to MRPC 8.4(d), the Court notes that Respondent had a valid reason to seek a postponement of the Liquefatto OAH hearing because of his poor health on October 27, 2010, regardless of the inept fashion in which the postponement was sought. The Court is not convinced by clear and convincing evidence that Respondent's actions in this matter were prejudicial to the administration of justice.

Therefore the Court finds by clear and convincing evidence that Respondent has violated MRPC 8.4(a) and 8.4(c).

Consequently, the Court finds that Petitioner has demonstrated by clear and convincing evidence that Respondent's misconduct with respect to the postponement of the Liquefatto OAH hearing scheduled on October 27, 2010, violated

Rules 3.3, 5.3(b), and 8.4(a) and (c) of the Maryland Lawyers' Rules of Professional Conduct.

### V. CONCLUSION

This Court, having heard this matter on August 27, 2012, and August 28, 2012, and having reviewed and considered the exhibits and testimony of the witnesses, respectfully submits its Findings of Fact and Conclusions of Law on this 12th of October, 2012.

(internal footnotes omitted).

█ In essence, the primary issue in this case involves a request for a postponement, submitted on October 27, 2010, from Fader's office, for an administrative hearing scheduled for the following day between Fader's client and DHMH. The postponement request, under Fader's signature, stated that Fader "suffered a Gran[d] Mal Seizure" and was "hospitalized" on October 27th; that he had been "issued a disability slip for the period until November 3, 2010, and instructed not to work"; and that he was on "heavy doses of anti-seizure medications." Accompanying the request was a certificate of service with Fader's signature, a copy of Fader's Keppra prescription, a disability slip purportedly issued by Dr. Foreman, one of Fader's treating physicians, that had been forged, and a cover letter with Fader's signature communicating to OAH's docket clerk that documents relating to the postponement request were attached. These documents were faxed to OAH at approximately 5:00 p.m. on October 27, 2010.

At approximately 8:30 p.m. on October 27, 2010, over three hours after Fader had represented that he had been hospitalized and submitted ostensible proof of that hospitalization, Fader called OAH and left a voicemail stating that he was on his way to Sinai Hospital because of his epileptic condition. Fader called OAH for a second time and left another voicemail at approximately 8:30 a.m. on October 28, 2010, stating that he was at Greater Baltimore Medical Center, but did not state why he was there.

On October 28, 2010, the administrative law judge granted the postponement request on the condition that Fader submit a note on letterhead from a doctor detailing Fader's medical condition on October 27 and 28, 2010. Thereafter, on November 4, 2010, Fader drafted a handwritten fax cover sheet, attached to which was a letter purportedly from Dr. Foreman, but actually created by Ms. Collier, stating that on the evening of October 26, 2010 (a date inconsistent with the one represented in the postponement request), Fader had been transported to the emergency room at Sinai Hospital because of his "feelings of cognitive disorientation" and "tremors in [his] upper extremities bilaterally." The letter also stated that Fader had been released on October 27th with a disability slip excusing him from work until November 3, 2010.

At the subsequent hearing on December 15, 2010, when given the opportunity to explain the events of October 27 and 28, 2010, which led to the postponement, Fader stated before the administrative law judge that he had filed the motion for postponement and attached a copy of his Keppra prescription. He also continued to represent that he sought and received treatment on October 27, 2010.[18]

 "This Court has original and complete jurisdiction over attorney discipline proceedings in Maryland." *Attorney Grievance v. Chapman*, 430 Md. 238, 273, 60 A.3d 25, 46 (2013), quoting *Attorney Grievance v. Seltzer*, 424 Md. 94, 112, 34 A.3d 498, 509 (2011). In our independent review of the record, "[w]e accept the hearing judge's findings of fact as prima facie correct unless shown to be clearly erroneous." *Attorney Grievance v. Rand*, 429 Md. 674, 712, 57 A.3d 976, 998 (2012), quoting *Attorney Grievance v. Stern*, 419 Md. 525, 556, 19 A.3d 904, 925 (2011). We conduct an independent

---

18. Fader testified that he had gone to Sinai on a "Tuesday," which would have been October 26, 2010. It is clear from the context of this statement, however, that he was referring to October 27, 2010, the date that he had filed the postponement request.

review of the hearing judge's conclusions of law pursuant to Rule 16–759(b)(1).[19]

Neither party filed exceptions to the hearing judge's Findings of Fact and Conclusions of Law regarding the conditional diversion agreement, which had been revoked as a result of the misconduct involved with the misrepresentations to OAH and involved a separate set of circumstances concerning two of Fader's attorney trust accounts. We accept those findings of fact as established by clear and convincing evidence, pursuant to Maryland Rule 16–759(b)(2)(A). Also, we agree with Judge Welch's conclusions that Fader violated Rule 1.15(a) and Maryland Rules 16–606.1 and 16–607 based on Fader's admission in the conditional diversion agreement.

Judge Welch also determined that Fader violated Rules 1.15(b) and 8.4(a) and (d), charges to which Fader did not admit in the conditional diversion agreement. We will address each in turn.

Rule 1.15(b) provides, "[a] lawyer may deposit the lawyer's own funds in a client trust account only as permitted by Rule 16–607 b." Fader, having admitted the violation of Rule 16–607(b) in his conditional diversion agreement, also violated Rule 1.15(b).

Rule 8.4(d) provides that it is professional misconduct for a lawyer to "engage in conduct that is prejudicial to the administration of justice." "[T]he commingling of personal and client funds, including the failure to maintain a separate trust account, is prejudicial to the administration of justice." *Attorney Grievance v. Goodman*, 426 Md. 115, 128, 43 A.3d 988, 995 (2012). In the present case, Fader transferred all client funds from ATA 1 to ATA 2 and subsequently used ATA 1 as his personal account into which he deposited his own funds and from which he paid his rent. At one point, his

---

**19.** Rule 16–759(b)(1) provides:

**Review by Court of Appeals.** (1) Conclusions of law. The Court of Appeals shall review de novo the circuit court judge's conclusions of law.

personal use resulted in an account overdraft. Into ATA 2, he deposited client funds as well as personal moneys and from which he made "counter withdrawals"[20] that were not associated with any client. There is no question that Fader's misuse of his attorney trust accounts and commingling of funds violated Rule 8.4(d).

With respect to the misrepresentations to OAH and the administrative law judge, the disputes between Bar Counsel and Fader regarding their exceptions to the findings of fact go to whether Fader filed the postponement request and the related materials to OAH and whether Fader testified before the administrative law judge, on December 15, 2010, that he sought and received treatment at Sinai on October 27, 2010.

Bar Counsel excepts to the hearing judge's findings of fact, those being included in paragraphs fifty-four and fifty-five, which state:

54. Ms. Collier created and faxed a postponement request to the OAH, which was accompanied by a copy of the label on Respondent's prescribed seizure medication and an altered out-of-work slip from Dr. Foreman, Respondent's treating physicians at Sinai Hospital. Ms. Collier had altered the dates on a previously issued out-of-work slip prior to faxing a copy to the OAH.

55. Ms. Collier faxed this postponement request with a copy of Respondent's signature as well as the supporting materials she had created to the OAH at approximately 5:00 p.m. on October 27, 2010.

Bar Counsel contends that the hearing judge committed error when he found that Collier, as opposed to Fader, created and faxed the postponement request to OAH and also submitted documentation regarding Fader's condition.

---

**20.** "The term 'counter withdrawal' refers to the common practice of withdrawing funds from a bank account in person by filling out, signing and presenting a withdrawal slip to a bank teller." *W & D Acquisition, LLC v. First Union National Bank,* 262 Conn. 704, 817 A.2d 91, 94 n.7 (Conn.2003).

The hearing judge, essentially, credited Fader's and Collier's testimony during the grievance hearing, in which Collier was identified as having sent the altered documents, rather than Fader's admission before the administrative law judge that it was he who had submitted the documents. As recently as *Attorney Grievance v. Zimmerman*, 428 Md. 119, 134, 50 A.3d 1205, 1214 (2012), we opined that:

> In attorney discipline proceedings, this Court has original and complete jurisdiction and conducts an independent review of the record. We accept a hearing judge's findings of fact unless we determine that they are clearly erroneous. That deference is appropriate because the hearing judge is in a position to assess the demeanor-based credibility of the witnesses. In that regard, the hearing judge is permitted to pick and choose which evidence to rely upon from a conflicting array when determining findings of fact.

Obviously, the hearing judge was presented with conflicting testimony regarding the author of the altered documents that were submitted in support of Fader's postponement request. The choice to credit the testimony before him, as opposed to that before the administrative law judge, was well within the purview of a hearing judge's discretion. *Id.* The judge's findings were supported by the evidence he found credible and, therefore, are not clearly erroneous. *Attorney Grievance Comm'n v. Zdravkovich*, 375 Md. 110, 126, 825 A.2d 418, 427 (2003) ("[W]e accept the hearing judge's findings of fact as *prima facie* correct unless shown to be 'clearly erroneous,' and we give due regard to the hearing judge's opportunity to assess the credibility of witnesses." (internal quotation marks and citations omitted)) As a result, we overrule Bar Counsel's exception.

Fader excepts to the hearing judge's factual finding that

> [a]t the December 15, 2010 OAH hearing, Respondent also represented to the OAH that he sought and received treatment at Sinai Hospital where he was informed that he was experiencing seizures, which had been diagnosed as idiopathic epilepsy without any kind of particular stimulating

factor, and that he was having a stress reaction to the prescribed Keppra.

Fader claims that the finding "inaccurately" states his testimony before the administrative law judge on December 15, 2010, because he never testified that he "sought and received treatment at Sinai Hospital." We will overrule this exception because Fader testified in the OAH hearing on December 15, 2010, that he had gone to Sinai Hospital on October 27, 2010, and received the following diagnosis: "what they had basically said is that I was experiencing seizures which had been diagnosed as idiopathic epilepsy without any kind of particular stimulating factor," and that "apparently I was having a stress reaction to the Keppra which I take 750 mg. twice a day." [21]

Fader also excepts to the finding that his voicemails left on October 27 and 28, 2010, were untruthful, claiming that the two separate voicemails were "independently accurate." The hearing judge stated with respect to the voicemails:

that in calling the OAH on the morning of October 28, 2010, and stating only that he was at GBMC after having called the previous evening stating that he was at Sinai Hospital being treated for his seizure disorder, Respondent knowingly misled the OAH by failing to state that he was at GBMC to witness the birth of his child. Respondent's failure to correct the basis of his postponement request from his medical seizure condition to the impending birth of his child constitutes a misrepresentation.

Fader called OAH in the evening of October 27, 2010, and left a voicemail with OAH stating that he was on his way to Sinai Hospital because of his epileptic condition. The next morning, at 8:30 a.m., Fader left a second voicemail at OAH simply stating that he was at Greater Baltimore Medical Center.

---

21. In another exception to one of the hearing judge's findings of fact, Fader also points to the typographical error in paragraph sixty-five in which the hearing judge misstated the date in which Fader had called OAH to inform the administrative law judge that he was at the Greater Baltimore Medical Center. The correct date is October 28, 2010 rather than October 28, 2012. We sustain this exception and note that this error was replicated in Findings 57, 63, and 74.

Fader did not inform the administrative law judge that he was present at GBMC for the birth of his child, rather than for treatment relating to his seizures, an omission that constitutes a misrepresentation of the basis for his postponement request. Judge Welch's finding that Fader, in his voicemails to the OAH, misled the administrative law judge as to the basis of his request for postponement is supported by record; thus, we overrule Fader's exception.

Fader also excepts to the finding that he failed to correct the misrepresentations in his voicemails during the hearing on December 15, 2010; he excepts, thereby, to the conclusions that he violated Rule 3.3(a)(1) and (4) and 8.4(c). Fader contends that the administrative law judge became aware that Fader had been at Greater Baltimore Medical Center for the birth of Fader's baby, so that, at the hearing, Fader had "corrected any misunderstanding as to the basis as to why he was not present at OAH on the morning of October 28, 2010." Judge Welch found, however, with respect to Fader's failure to correct his prior misrepresentations:

> [T]he Court finds by clear and convincing evidence that on December 15, 2010, when Respondent appeared before Judge Sinrod, he further failed to correct his previously made false statement made to the OAH in the voicemail left the evening of October 27, 2010, regarding his treatment at Sinai Hospital. Further, in light of both Ms. Collier and Respondent's testimony that they left Sinai Hospital's emergency room due to the large crowd and Ms. Collier's discomfort prior to Respondent receiving any treatment or diagnosis from a physician, Respondent overtly misled Judge Sinrod on December 15, 2010.

On the date of the rescheduled hearing, December 15, 2010, the administrative law judge, before hearing the merits of the case between Fader's client and DHMH, entertained argument with respect to DHMH's motion for default, which was premised upon Fader having failed to appear on October 28, 2010 and upon the forged doctor's note from Fader to OAH on November 4, 2010. The transcript of the hearing on DHMH's motion for default supports Judge Welch's finding that Fader

failed to correct the misrepresentations made with respect to Fader's postponement request; although Fader alluded to the birth of his child, he does not correct any of his prior misrepresentations:

You have 10/28/2010 at 10:30 in the morning my workshop at GBMC. I left a message that I was at GBMC on that morning. The fact is as I told Mr. Young. He said if you wanted—I told Mr. Young I didn't recall whether or not I had left a message but I was at GBMC because of the epilepsy.

I got correspondence from you and I looked for the letter that you had apparently sent my office with regard to Ms. Liquefatto's case where we were supposed to produce some correspondence.

Honestly, in the week that followed the birth of my child on this particular day, all I could say is I left a message for my part-time paralegal saying this happened on Tuesday. I was told before I was not going to be there on Thursday because of epilepsy. I sent them stuff.

You got to get stuff documented. And we corresponded back and forth about that. Get whatever you need, send over there, send it to the court.

Frankly, at GBMC I don't know that this is Dr. Foreman's signature but frankly, well, I don't have the documents with me that apparently were submitted. I don't know what my paralegal did, in all due honesty.

Whether or not she came and created some documents that documented it because I had spent four days in Sinai last December after I had my initial grand mal seizure.

I was there again in May and in September I had a grand mal again in May. I had a bad reaction to the Kepra [*sic*] on or about September 1, and then again on the 26th of October where apparently they said it was stress induced behavior . . .

On that particular morning this is where I was. Frankly. I advised Ms. Lique—and I can speak to, and having

practiced before this court and other courts for 23 years in this state and in the state of Florida.

I would never perpetrate a fraud on the court. Frankly, as you can see, this is a case that Ms. Liquefatto and I have invested a great deal of time and commitment to. I apologize, honestly, I have to apologize just as I did to Mr. Young as counsel and as an attorney as well.

I understand that the court's time is valuable and Mr. Young's time is valuable and he was here apparently on the 28th with his witnesses and Ms. Liquefatto was not notified. I have to say that I did not attend at all.

But I think that any kind of sanction, I'll be happy to follow up and investigate, the fact is, is any kind of sanction shouldn't be against Ms. Liquefatto, I think that day.

We're prepped as he is today to proceed. I will say at the last moment certainly had I had more notice of this correspondence which apparently Mr. Young faxed over in our office on Northern Parkway with various other lawyers and a bunch of tax people that are here and there. Or in and out, I have one part-time paralegal who comes in frankly when she says she's not; and doesn't come in when she says she is.

And so I'm left here somewhat flabbergasted, but with a credible excuse about where I was on that particular day. And I would hope that you would not sanction Ms. Liquefatto in light of circumstances.

In the only other reference to the birth of his child, Fader also had failed to correct the misrepresentations:

I'd be happy to produce the, whatever documentation is necessary, Your Honor. I was there throughout the process. I was there when this child was born, if I have to have the delivering doctor indicate that I was in the delivery room as this child was born. I'll be happy to produce such documentation, if necessary.

And as I had noted to Mr. Young, I had actually had other proceedings set for that Thursday, that I had had canceled, arranged to be at, had other, other counsel ar-

ranged to be at so that I could be here in this court. I had counsel at the Circuit Court for Baltimore County and other proceedings scheduled for that day.

My fiancée, she was scheduled for the following Monday to be induced and so that was our inducement, scheduled inducement day, and I got correspondence that (inaudible). You better go to the hospital.

And I called from GBMC on that morning. I think misstated, I had been to Sinai. I've been treating at Sinai and that the center next to Sinai, the Brain Institute at Sinai, but our baby was born at GBMC.

The transcript supports Judge Welch's findings that Fader failed to correct the misleading information in his voicemail, and, thus, we overrule Fader's exception in that regard.

Fader's misleading voicemail on October 28, 2010, and his failure to correct his misleading statements therein on December 15, 2010 are clearly violative of Rule 3.3(a)(1), which states, "[a] lawyer shall not knowingly: (1) make a false statement of fact or law to a tribunal or fail to correct a false statement of material fact or law previously made to the tribunal by the lawyer[.]" Fader, by orally misrepresenting to the administrative law judge, at the hearing on December 15, 2010, that he had sought and received treatment at Sinai Hospital, also violated Rule 3.3(a)(4), which states, "[a] lawyer shall not knowingly: (4) offer evidence that the lawyer knows to be false. If a lawyer has offered material evidence and comes to know of its falsity, the lawyer shall take reasonable remedial measures." *See Attorney Grievance v. Blum*, 373 Md. 275, 302, 818 A.2d 219, 235 (2003).

Also, Fader violated Rule 8.4(c), which states that it is professional misconduct for a lawyer to "engage in conduct involving dishonesty, fraud, deceit or misrepresentation." In *Attorney Grievance v. McClain*, 406 Md. 1, 16, 18, 956 A.2d 135, 144–45 (2008), we concluded that McClain had violated Rule 8.4(c) where he had lied to a tribunal that his client had settled on a property under dispute in a partition action, when the client had not, and had misrepresented what a judge had

said in a brief to the Court of Special Appeals. Similarly, Fader "knowingly misled" the administrative law judge when he left the voicemail message stating he was at GBMC without noting that it was for the birth of his child and not an epileptic episode, as he had represented in his previous voicemail. This misrepresentation, made to a tribunal, is violative of Rule 8.4(c).

Bar Counsel excepts to the hearing judge's failure to conclude that Fader violated Rule 8.4(d), which provides that it is professional misconduct for a lawyer to "engage in conduct that is prejudicial to the administration of justice[.]" We shall sustain Bar Counsel's exception. The hearing judge's conclusion that Fader did not violate Rule 8.4(d) was based on his belief that because Fader had a valid reason to request a postponement—his poor health—he committed no misconduct under subsection (d), "regardless of the inept fashion in which the postponement was sought." While it is true that Fader could have sought, and most likely would have been granted, a postponement if he had submitted a truthful request, it is Fader's dishonesty in dealing with the administrative law judge that is violative of Rule 8.4(d). In *Attorney Grievance v. Pak,* 400 Md. 567, 929 A.2d 546 (2007), we explored Rule 8.4(d) in the context of dishonest conduct and explained that, "[a]n attorney who fails to respond truthfully brings the legal profession into disrepute and is therefore acting in a manner prejudicial to the administration of justice." *Id.* at 607–08, 929 A.2d at 570. Judge Welch found that Fader "overtly misled" the OAH when he appeared before the administrative law judge and "represented to the OAH that he sought and received treatment at Sinai Hospital," when, in fact he had not. Fader's statements made to the administrative law judge in an effort to defend the validity of his postponement request constitute a violation of Rule 8.4(d).

Judge Welch also concluded that Fader violated Rule 5.3(b), which relates to a nonlawyer employed by a lawyer. Rule 5.3(b) provides, "a lawyer having direct supervisory authority over the nonlawyer shall make reasonable efforts to ensure that the person's conduct is compatible with the professional

obligations of the lawyer." While working under Fader's supervision, Ms. Collier forged a letter purportedly from Dr. Foreman that was faxed to OAH from Fader's office with his handwritten cover sheet on November 4, 2010, as an attempt to support the representations made in the postponement request. Clearly, he violated Rule 5.3(b).

Additionally, because Fader violated Rules 1.15(a) and (b), 3.3(a)(1) and (4), 5.3(b), and 8.4(c) and (d), and Maryland Rules 16–606.1 and 16–607, we agree with Judge Welch's conclusion that Fader also violated Rule 8.4(a), which provides, "[i]t is professional misconduct for a lawyer to: (a) violate or attempt to violate the Maryland Lawyers' Rules of Professional Conduct. . . ."

■ Having concluded that Fader violated multiple rules, we turn to the appropriate sanction. Bar Counsel recommends disbarment; Fader recommends the imposition of a suspension, citing *Attorney Grievance v. Paul,* 423 Md. 268, 31 A.3d 512 (2011) and *Attorney Grievance Comm'n v. Goldberg,* 292 Md. 650, 441 A.2d 338 (1982) as cases in which a sanction less than disbarment was imposed for similar conduct.

■ Our principal goal in sanctioning attorneys for violations of the Rules of Professional conduct is not to punish the errant attorney, but to protect the public. *Attorney Grievance v. Chapman,* 430 Md. 238, 277, 60 A.3d 25, 49 (2013). "[W]e consider the nature of the ethical duties violated in light of any aggravating or mitigating circumstances." *Paul,* 423 Md. at 284, 31 A.3d at 522. For guidance, we often rely on the factors included in Standard 9.22 of the American Bar Association Standards for Imposing Lawyer Sanctions:

(a) prior disciplinary offenses;

(b) dishonest or selfish motive;

(c) a pattern of misconduct;

(d) multiple offenses;

(e) bad faith obstruction of the disciplinary proceedings by intentionally failing to comply with rules or orders of the disciplinary agency;

(f) submission of false evidence, false statements, or other deceptive practices during the disciplinary process;

(g) refusal to acknowledge wrongful nature of conduct;

(h) vulnerability of victim;

(i) substantial experience in the practice of law;

(j) indifference to making restitution.

*Attorney Grievance v. Bleecker,* 414 Md. 147, 176–77, 994 A.2d 928, 945–46 (2010).

■ With respect to factor (a), Fader had been reprimanded in 2003 for using marijuana on an airplane, for transporting drug paraphernalia on the flight, and for making statements that could be construed by others as a claim by him to be a police officer.

Factor (c), "a pattern of misconduct," is also present in this case. We have held that an attorney can engage in a pattern of misconduct when he commits a number of acts in order to achieve a common goal. *See Attorney Grievance v. Coppola,* 419 Md. 370, 406, 19 A.3d 431, 452–53 (2011). Fader misrepresented the basis of his postponement request to OAH by implying that he was at GBMC for epilepsy treatment, and he continued to misrepresent and failed to correct the misrepresentations at the December hearing at OAH.

Fader committed multiple offenses, implicating factor (d), because he not only committed numerous violations related to the postponement request before OAH, but also commingled personal and client moneys in two trust accounts. *See Bleecker,* 414 Md. at 177–78, 994 A.2d at 946.

Factor (i), which is "substantial experience in the practice of law," is present, because Fader has been a member of the Maryland Bar since 1989 and a member of the Florida Bar since 1986. The fact that Fader has spent over twenty years practicing law is clearly an aggravating factor. *See Coppola,* 419 Md. at 406–07, 19 A.3d at 453; *Attorney Grievance v. Nwadike,* 416 Md. 180, 202, 6 A.3d 287, 299–300 (2010); *Attorney Grievance v. Mininsohn,* 380 Md. 536, 576, 846 A.2d 353, 376–77 (2004).

■ "[C]andor by a lawyer, in any capacity, is one of the most important character traits of a member of the Bar." *Attorney Grievance v. White*, 354 Md. 346, 364, 731 A.2d 447, 457 (1999). When a lawyer lies to a tribunal, he or she violates a norm that warrants disbarment.

In *White*, 354 Md. at 367–68, 731 A.2d at 459, the lawyer was disbarred after she was determined to be in violation of Rules 3.3(a)(1) and (4), Rule 3.4(a), and Rule 8.4(b), (c), and (d), when she lied in a series of judicial proceedings about her representation of private clients as an assistant public defender after such private practice was banned. In *Attorney Grievance v. Goodman*, 381 Md. 480, 850 A.2d 1157 (2004), we disbarred Goodman because he had impersonated another attorney: he had submitted pleadings falsely listing the other attorney as counsel for the plaintiff; he had sent a letter to the court on printed letterhead that he had created, falsely identifying the other attorney as the attorney for the plaintiff; and he had falsely implied before a judge that the other attorney was the attorney in the case but would not be present for trial.

In *Attorney Grievance v. McClain*, 406 Md. 1, 21, 956 A.2d 135, 146 (2008), we disbarred McClain after he had unilaterally scheduled, while the trustee was out of the country, a "sham" settlement of a property, under dispute in a partition matter in the circuit court and indicated falsely to the court that his client had settled on that property, when he knew that the trustee had not approved the settlement. When appealing the decision of the Circuit Court, McClain also misrepresented statements made by the trial judge. As a result of his intentional dishonesty in both courts, we disbarred McClain. In *Attorney Grievance v. Joseph*, 422 Md. 670, 707, 31 A.3d 137, 159 (2011), we disbarred Joseph because he misrepresented that he resided in Maryland when seeking *pro hac vice* admission in California, conduct we described as "dishonest, misleading, prejudicial to the administration of justice, and beyond excuse."

Fader's citations of *Attorney Grievance v. Paul,* 423 Md. 268, 31 A.3d 512 (2011) and *Attorney Grievance Comm'n v. Goldberg,* 292 Md. 650, 441 A.2d 338 (1982) are unavailing. In *Paul,* an attorney negotiated the dismissal of his clients from a pending lawsuit. After faxing his version of the settlement agreement to opposing counsel and receiving her edits, Paul copy-and-pasted opposing counsel's signature on his version and submitted it to the court as the final agreement. In reprimanding Paul, we noted that the hearing judge had found, and Bar Counsel had not taken exception to, the fact that Paul honestly believed he was authorized to do what he did and that there was no intent to defraud or mislead anyone. This situation is markedly different in that Fader *did* commit intentionally misleading conduct. Moreover, *Paul* involved a violation of only Rule 8.4(d), not the multitude of Rules that Fader has violated.

Fader's invocation of *Goldberg,* likewise, is without merit in the instant matter. *Goldberg* involved a violation of only one Disciplinary Rule relating to failing to supervise an employee and taking adequate steps to protect a client's interests; it did not involve misconduct, or any of the various other Rules Fader violated.

Fader misrepresented facts to OAH and the administrative law judge in order to secure a postponement and failed to correct his misrepresentations at the subsequent hearing before the administrative law judge on December 15, 2010. As Judge Welch found, Fader "overtly misled" the administrative law judge, and, accordingly, Joel Jay Fader is hereby disbarred.

**IT IS SO ORDERED; RESPONDENT SHALL PAY ALL COSTS AS TAXED BY THE CLERK OF THIS COURT, INCLUDING THE COSTS OF ALL TRANSCRIPTS, PURSUANT TO MARYLAND RULE 16–761, FOR WHICH SUM JUDGMENT IS ENTERED IN FAVOR OF THE ATTORNEY GRIEVANCE COMMISSION AGAINST JOEL JAY FADER.**